No. 22,425.

ROSANNA MCDOUGALL, as Administratrix, etc., *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

NEGLIGENCE—*Erection and Maintenance of Overhead Bridge—Death of Locomotive Engineer—Assumption of Risk.* In an action under the federal employers' liability act to recover damages for the death of a locomotive engineer who, while leaning out of the cab of his engine and looking backward, was struck by one of the steel girders of an overhead bridge, the special findings show that the clearance between the bridge and the side of the engine was approximately two feet; that deceased had been running an engine over the bridge for 15 years; that in the year previous to the accident he had run an engine of the same class over the same bridge 300 times, including 26 times in that month; that he had warned his fireman against the dangers in passing through the same kind of bridges; that the engine he was operating did not sway from side to side in going over the bridge more than was ordinarily the case in engines of similar type. *Held,* that defendant was entitled to judgment on the findings, because they establish that deceased had assumed the risk.

Appeal from Wyandotte district court, division No. 1; ED-WARD L. FISCHER, judge. Opinion filed January 10, 1920. Reversed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*W. W. McCanles, Charles E. Thompson,* and *H. F. Gorsuch,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Rosanna McDougall, as administratrix of the estate of her deceased husband, Paul W. McDougall, sued the Atchison, Topeka and Santa Fe Railway Company, to recover damages for the death of her husband while in the employ of the defendant. She recovered judgment for $11,000, and the defendant appeals.

The action is based on the federal employers' liability act of 1908 (Part 1, 35 U. S. Stat. at Large, ch. 149, p. 65). The petition averred and the defendant concedes that it is a corporation operating a line of railway as a common carrier in interstate commerce, and that Paul McDougall at the time he was killed was employed by the defendant in such commerce.

In the afternoon of August 28, 1917, Paul McDougall was the engineer in charge of engine No. 1837 attached to a freight train which left Emporia for Kansas City. Behind his engine there was attached engine No. 500, and at Quenemo the train was stopped on account of a hot box on the left main drive of engine No. 500. In a short time the train resumed its journey eastward. Between Quenemo and Pomona there are two covered bridges over the tracks of the defendant, about a mile and a half apart. When the train was approaching the first of these bridges a short distance west of Pomona, McDougall leaned out of the gangway on the left side, which was the fireman's side, and while looking back to see the condition of the main driving box on engine No. 500, he was struck by the right girder of the bridge and instantly killed. On this particular piece of track eastbound trains are operated over the left-hand track, and westbound trains over the right-hand track, in order to take advantage of better grades. An engineer going east is on the right-hand, or inside. In this instance McDougall crossed over to the fireman's side, and leaned out of the gangway, when his head same in contact with the bridge.

The petition averred that there was a curve in the railway track just as it approached this bridge; that the engine and train in passing through would swerve slightly; that there was less than two feet of space between the left side of the engine

and the girder of the bridge; and that the negligence of the defendant consisted in erecting and maintaining an overhead bridge under these conditions. The answer pleaded a general denial, contributory negligence, and assumption of risk.

In answer to a special question the jury returned a finding that bridge 69-A was not a standard bridge; defendant's motion to set aside this finding on the ground that it was contrary to the evidence was overruled. Photographs of bridge 69-A which were introduced in evidence show a modern double-track steel railroad bridge such as is in common and ordinary use throughout the country. Defendant's division engineer, with 20 years' experience and in whose territory the bridge is located, testified that the bridge was constructed in 1905 when the double track was built; that he had made measurements of the bridge in August after McDougall's death; that the tracks, which are 14 feet center, are centered on the bridge; that it is 7 feet from the center of the north track to the inside of the north end posts; and that the bridge is a standard width bridge. He further testified:

"All bridges on the Santa Fe are built to a standard. The bridge company have a standard plan from which they build a bridge, and they are all constructed just to a standard width. This is a requirement of the engineers of the company. They don't leave it to the discretion of the man who builds the bridge how wide it shall be, the bridge engineer tells him what the standard is. This bridge is as wide as any that I know of."

The conductor of McDougall's train, who was a witness for the plaintiff, testified on cross-examination that bridge 69-A is what is known as a standard bridge on the Santa Fe. No experienced railway engineers were called by the plaintiff to establish the contrary, although a locomotive engineer in the employ of another road was called by the plaintiff to establish other facts. The plaintiff offered no evidence to show that on the defendant's road, or that upon other railroads, bridges are required to be constructed with a greater clearance. One of plaintiff's witnesses, a county surveyor who had also served as city engineer for a number of years, testified that he had taken a measurement of a covered double-track truss bridge (not on the Emporia cutoff, but on another main-line track of the defendant), and found the width between the girders to be 2 inches more than the width of bridge 69-A.

His testimony did not disclose what the clearance was between the sides of the bridge and the tracks.

The finding that the bridge was not of standard construction on defendant's line of railway is not only contrary to the evidence, but is unsupported by any evidence, and should have been set aside.

George A. Smith, a former employee of the defendant, was the principal witness for the plaintiff. He was the fireman on the second engine, No. 500, at the time McDougall was killed. He had worked as a fireman under McDougall. His deposition was taken at Camp Pike, Ark., after he had left the employ of the company and had entered the army. He testified:

"I had known Mr. McDougall for four or five years and during that time he had been an engineer for the Santa Fe, and had been running over that piece of track during that time. As fireman I have been going through there the length of time I have stated. I knew the danger. I had it preached into me. Paul McDougall preached it into me, for one. Paul McDougall, the deceased, warned me of the danger of being on the outside of my engine in passing through these bridges."

On redirect examination, he testified:

"McDougall had warned me about passing through different bridges on the system, not any particular bridge."

Although it was averred in the petition that there was a curve in the railway track as it approached bridge 69-A, where McDougall was killed, the special findings of the jury are that the track was straight from the bridge to a point 4,800 feet west, and that the track was well ballasted and was level between these points. The jury's special findings also show that for 15 years before he was killed, Paul W. McDougall was in the employ of the defendant as a locomotive engineer, running on the division between Emporia and Argentine over the bridge in question; that during the last year of his life, from August 28, 1916, he ran an 1800 class engine over this bridge 300 times, including 23 times in June, 25 times in July, and 26 times in August, 1917; that engine No. 1837, on which he was killed, did not sway from side to side in going over the bridge more than was ordinarily the case in engines of similar type; and that the 1800 type of Santa Fe railway engines in use on defendant's road are substantially alike as to height, width and construction.

McDougall v. Railway Co.

The jury made a further finding to the effect that before the accident McDougall warned George A. Smith, a fireman, against the danger of passing through different bridges on the Santa Fe railway system. There is a finding that the clearance between the tender of engine No. 1837 and the inside girder on the north side of the bridge at a distance of 8½ feet above the rails, with the engine standing still, was 23¼ inches. The jury also found that the defendant's negligence consisted in maintaining a bridge with insufficient clearance for the safety of employees.

The federal employers' liability act, upon which this action is based, has been construed by the federal courts, and the decisions are controlling in cases arising under the act. (*Spinden v. Railway Co.*, 95 Kan. 474, 148 Pac. 747; *Roebuck v. Railway Co.*, 99 Kan. 544, 162 Pac. 1153.) In *Seaboard Air Line v. Horton*, 233 U. S. 492, it was held that the act having expressly eliminated the defense of assumption of risk in certain specified cases, made it clear that in all other cases it was intended that such assumption shall have its former effect as a bar to an action by the injured employee. In the syllabus of that case it was ruled—

"When the employé knows of a defect in the appliances used by him and appreciates the resulting danger and continues in the employment without objection, or without obtaining from the employer an assurance of reparation, he assumes the risk even though it may arise from the employer's breach of duty." (Syl. ¶ 7.)

The findings in the instant case establish the fact that Paul McDougall knew as much about the condition of the bridge as any officer or employee of the defendant, and that he appreciated the danger that might result from the conditions, and therefore that he assumed the risk. The case of *Tuttle v. Milwaukee Railway*, 122 U. S. 189, is in point. In that case Tuttle, who was a brakeman, was coupling cars which stood on a track or siding on which there was a very sharp curve, so that the drawheads failed to meet, and passed each other, allowing the cars to come so close together that he was crushed. The opinion in the case was written by Mr. Justice Bradley, and in the course of the opinion it was said:

"The brakeman and others employed to work in such situations must decide for themselves whether they will encounter the hazards incidental thereto; and if they decide to do so, they must be content to

assume the risks. . . . The perils in the present case, arising from the sharpness of the curve, were seen and known. They were not like the defects of unsafe machinery which the employer has neglected to repair, and which his employees have reason to suppose is in proper working condition. Everything was open and visible, and the deceased had only to use his senses and his faculties to avoid the dangers to which he was exposed. One of these dangers was that of the drawbars slipping and passing each other when the cars were brought together. It was his duty to look out for this and avoid it. The danger existed only on the inside of the curve. This must have been known to him. It will be presumed that, as an experienced brakeman, he did know it; for it is one of those things which happen, in the course of his employment, under such conditions as existed here. . . . The only conclusion to be reached from these undoubted facts is, that he assumed the risks of the business, and his representative has no recourse for damages against the company." (pp. 194, 195, 196.)

The danger to McDougall was necessarily continuous and apparent, even to casual observation. The findings as to his knowledge and experience, which show that he had been employed as a locomotive engineer running over this particular track for 15 years; that in the preceding 12 months he had run an engine of the same type over this bridge 300 times; and that he had "preached" to brakeman Smith of the very danger that caused his own death, bring the case within many of our own decisions. (See *Rush, Adm'x, v. Mo. Pac. Rly. Co.,* 36 Kan. 129, 12 Pac. 582; *Clark v. Mo. Pac. Rly. Co.,* 48 Kan. 654, 29 Pac. 1138; *Murphy v. Edgar,* 83 Kan. 627, 112 Pac. 109, and cases cited in those opinions.) In the Rush case, it was said:

"If the danger is as well known to the servant as it can be to the master, another principle enters in to prevent the servant from recovering from the master for any injuries that might result from the supposed danger, and that principle is this: If the servant has full knowledge of the danger, and continues in the master's employment without complaint, receiving from the master full pay for his services, he assumes the risk himself of the known danger, and waives any negligence that might otherwise be imputable to the master." (p. 136.)

As was said in the opinion in *Briggs v. Railroad Co.,* 102 Kan. 441, 446, 175 Pac. 105:

"It would be fatuous to say he was not aware of them [the dangers], and it would be an impeachment of the mental capacity of a competent man to say he did not appreciate them."

In *Taylor v. Chicago, R. I. & P. Ry. Co.* (Iowa) 170 N. W.

McDougall v. Railway Co.

388, the facts were quite similar to the instant case. A locomotive engineer running from Valley Junction, Iowa, to Trenton, Mo., was compelled to pass under a viaduct; the train was running 25 miles an hour, and an abutment supporting the viaduct struck the plaintiff on the head. It was shown in that case that plaintiff had passed the viaduct for three years. It was held that he could not recover because he had assumed the risk.

In *Boldt v. Pennsylvania R. R. Co.*, 245 U. S. 441, an action brought under the federal act to recover damages for the death of a railway employee, it was said:

"At common law the rule is well settled that a servant assumes extraordinary risks incident to his employment or risks caused by the master's negligence which are obvious or fully known and appreciated by him." (p. 445.)

The plaintiff relies upon the decision in the case of *Cloud v. Railway Co.*, 82 Kan. 851, 109 Pac. 400, where an engineer was killed by being struck by a girder of a bridge while leaning out of the cab window and looking for a signal from the conductor of the train. The opinion (which was *per curiam*) states that the clearance between the locomotive and the upright part of the bridge was about 23 inches, when the locomotive was erect and standing still; that when moving rapidly the locomotive tipped and swayed from side to side, so that it came within a few inches of the girder of the bridge. It was held that he had not assumed the risk. In the opinion it was said:

"Different types and sizes of engines are used on the railroad. Some tilt and sway more than others. In view of the difficulty in determining the distance between swaying locomotives and the side of the bridge, and all of the other facts in the case, it cannot be held that there was an assumption of risk." (p. 853.)

No facts are stated in the opinion showing what experience the engineer had had in operating engines of the same size over the bridge, nor are any facts stated indicating the extent of his knowledge of the conditions or of his appreciation of the danger. In the present case the only conclusion to be reached from the conceded facts is that McDougall assumed the risk.

In his brief, plaintiff's counsel presents what it is insisted

is another reason why assumption of risk should not bar plaintiff from recovering. It is said:

"This was an extraordinary risk. It was created by a sporadic act of negligence on the part of the employer in causing the engineer, McDougall, to haul an engine that was in a defective condition. . . . The plaintiff in her petition alleges that the decedent had repaired the hot box on a smaller engine, which was being taken to Argentine, Kan., and at the time of the decedent's death he was watching said hot box."

The petition does not suggest that there was any other engine on the train except the one upon which McDougall was engineer. The only reference to the hot box is as follows:

"That about 5:39 o'clock p. m., the said Paul W. McDougall, in charge of engine No. 1837, as aforesaid, stepped down on the fireman's side of the engine, to inspect a hot box that was on the side of the engine."

It is true, the evidence showed that the smaller engine was being taken to Argentine to be used in local freight, and that at Pomona there was a delay of a few minutes because of a hot box on this engine. It is now insisted that we have a case where an engine was being moved that was in a defective condition, that it was being used in pulling this interstate train and was running under its own steam; and that "It was in a state of being repaired at the very time that engineer McDougall leaned out of the gangway to look at the hot box. It was being used in violation of law and, therefore, the decedent did not assume any risk for any injury which he received directly or indirectly on account of the movement of said engine." This belated claim is based upon the provisions of Part 1, 36 United States Statutes at Large, ch. 103, § 2, p. 913, making it unlawful for a common carrier to use any locomotive in moving interstate traffic, unless the boiler, locomotive and appurtenances are in proper condition. It is said the court did not instruct the jury relative to this phase of the case. The reason is apparent; the point was not suggested to the court; had not been raised in the pleadings; and is presented here for the first time.

There is no merit in the contention. If the point had been raised below, and if it could be said that the hot box on engine No. 500 made that engine a defective engine within the meaning of the act upon which plaintiff now seeks to rely, it must be obvious that the defect was in no respect the cause of the

McDougall v. Railway Co.

death of Paul McDougall.  It was neither the proximate cause, nor did it have anything to do with his head coming in contact with the bridge girder.  The proximate cause of his death was his negligent act in leaning out of the engine cab while passing through the bridge.

It follows that the judgment will be reversed and the cause remanded with directions to enter judgment for the defendant.

PORTER, J. (concurring specially) :  I agree that the plaintiff cannot recover because McDougall assumed the risk, but I am also of the opinion that no negligence was shown against the defendant.  The weight of reason, as well as of authority, supports the rule that the manner in which a railroad company constructs and maintains its permanent structures, is a matter of engineering, and not a question to submit to the jury.  The question of negligence was before the supreme court of the United States in *Tuttle v. Milwaukee Railway*, 122 U. S. 189.  The negligence charged was in the construction of the tracks with a sharp curve which caused the drawheads to pass each other and the cars to come so close together that the brakeman was crushed.  In the opinion Mr. Justice Bradley said:

"We do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less that it should be left to the varying and uncertain opinions of juries to determine such an engineering question. . . . It must be a very extraordinary case, indeed, in which their (railroads') discretion in this matter should be interfered with in determining their obligations to their employes." (p. 194.)

In *Boyd v. Harris*, 176 Pa. St. 484, it was said:

"This case presents a question, the importance of which extends far beyond the present parties and the judgment to be entered herein.  It is whether the location of the permanent structures along a line of railroad necessary to accommodate its business is to be determined by the railroad company or by a petit jury.  If by the former, they may be located with reference to the convenient and economical use of the railroad and the accommodation of its traffic.  If by the latter, these considerations will be lost sight of, and the proper location will be a shifting one to be settled by each successive jury in accordance with its own notions and the peculiar features of the case on trial.  One jury may hold a given location to be safe and proper.  The next jury may hold it to be unsafe and therefore improper. . . . Where they [permanent

structures] shall be placed and how they shall be arranged are questions that belong to the railroad company as truly as the location of the switches and sidings, or of the track itself; and the discretion of its officers is no more under the control of a petit jury in the one case than in the other." (p. 488.)

In *Baltimore, etc., R. Co. v. McOsker*, 44 Ind. App. 255, a brakeman was killed by his head coming in contact with the post of an overhead bridge, while standing on the gangway of the engine cab and leaning out. The distance from the outer edge of the gangway to the bridge was 2 feet 4¼ inches; the bridge had been maintained in the same condition five years; was the standard width recommended by a conference of engineers, and was in use by railroads generally. In the opinion it was said:

"The bridge in question was necessary to the operation of the road. Its size and the manner of construction should have reference to its purpose as a part of the system for the convenience of the railroad company's employees. The plan followed in constructing its permanent structures is a matter of engineering, and not a question to submit to a jury. . . . One jury might say that the bridge was too narrow, and another, that it was not." (p. 260.)

A case directly in point is *Ball v. Northern Pac. R. Co.* 102 Wash. 668, which was an action under the federal employers' liability act. The only difference in the two cases is that it was a head brakeman who was killed in that case, and the bridge was a single-track bridge in place of a double-track one. The head brakeman, whose duties required him to ride on the engine, was standing on the step between the engine and the cab, holding to the handholds on the engine, and leaning out looking backward, watching a hot box on one of the cars, when the engine passed through the bridge, the clearance of which was approximately 2 feet; the brakeman's head struck the iron girder at the end of the bridge, and he was killed. The bridge was shown to be one of a number of like bridges upon this division of the railroad, and to be a bridge of standard construction, 14 feet 6 inches wide in the clear between sides; and that there was a clearance of 24½ inches between the side of the engine and the side of the bridge. It was held that the defendant was not negligent in maintaining a bridge with a clearance of only 2 feet, where that was the standard construction and employees were not required to be upon the

McDougall v. Railway Co.

side of the cars or engines when passing over the bridge. The opinion quotes the case of *Krebbs v. Oregon R. & Nav. Co.*, 40 Wash. 138, which recognized a distinction in cases of injuries from signal posts, telegraph poles, etc., situated too close to the track. In the *Krebbs* case it was said:

"These structures differ materially from railroad bridges, which constitute a permanent part of the roadbed, and are of necessity part and parcel thereof."

The further citation of authorities seems unnecessary. I think it is plain that the defendant had the right to use its own methods in the construction of its tracks and bridges, and where they are reasonably safe, and the danger open and apparent, the fact that the clearance is approximately but two feet, as in this case, constitutes no showing of negligence.

In the case of *Cloud v. Railway Co.*, 82 Kan. 851, 109 Pac. 400 (cited in the majority opinion), it was not only decided that the engineer had not assumed the risk, but that there was proof enough to establish negligence in the railway company's placing its track so close to the girders of the bridge where it was necessary for the engineer to lean out in order to get signals. The clearance in that case was the same as in the case at bar, about 23 inches. In my opinion, the case was decided wrong. The meager statement of facts in the *per curiam* opinion furnishes nothing to distinguish it from other cases. I think it should be overruled, both on the question of assumption of risk and on the question of negligence of the defendant.

I am authorized to say that MARSHALL and DAWSON, JJ., join in this special concurrence.