No. 30,960.

F. M. Pipkin, *Appellee*, v. The Midland Valley Railroad Company, *Appellant.*

(19 P. 2d 701.)

Opinion filed March 11, 1933.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, and *O. E. Swan,* Muskogee, Okla., for the appellant.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach, Wm. E. Cunningham,* all of Arkansas City, *F. P. Sizer* and *H. A. Gardner,* both of Monett, Mo., for the appellee.

The opinion of the court was delivered by

Johnston, C. J.: This action was brought by F. M. Pipkin against the Midland Valley Railroad Company under the federal employers' liability act to recover damages for injuries which he sustained while employed by the defendant as a locomotive fireman, caused, it is alleged, by a defective and unsafe track negligently maintained and, also, the excessive speed of the train over the defective track. At a trial with a jury the general verdict was in favor of plaintiff, awarding him damages in the sum of $15,000, and with it the jury returned the following special findings of fact:

"1. Was the plaintiff familiar with the track in question and with the operation of locomotive and trains over it? A. Yes.

"2. How much experience had the plaintiff had as a locomotive engineer and fireman? A. 17 years.

"3. State approximately the extent of the experience of the plaintiff either

as a locomotive engineer or fireman operating a locomotive over the track in question. A. 11 years.

"4. How many times had the plaintiff worked as a ·fireman on a locomotive over this particular track from October 24, 1928, to the date of the accident? A. 27 times.

"5. If you find that there existed a defect in the track at the time of this accident causing plaintiff to fall, state of what such defect consisted. A. Bad track, bad ties and low joints.

"6. If you find there was a defect, state whether or not it was such as to render the track unsafe and dangerous to employees operating trains over the same. A. Yes.

"7. If you find the track was defective and thereby unsafe and dangerous to employees operating trains over it, how long had such condition existed? A. Middle of November, 1928.

"8. If you find that the track was defective and thereby unsafe and dangerous to employees operating trains over it, was such defective condition and the danger therefrom obvious to an ordinarily prudent person, with the experience of the plaintiff, operating over the same under the same circumstances under which·the plaintiff operated over it? A. No.

"9. Was the condition of the track in question such that a person of ordinary care and prudence under similar circumstances as the defendant would anticipate danger or injury therefrom? A. Yes."

Defendant operates a railroad from Fort Smith, Ark., to Wichita, Kan., which passes through Silverdale, near which the defendant has a water tank. At the time of the accident plaintiff was operating as a fireman on a passenger train, and as it approached the tank where water was to be taken for the engine, plaintiff prepared a solution, designed to improve the quality of the water, which it was his duty to prepare and carry over the tender to the water tank on the engine and there pour it into the tank of the engine before taking water from the track tank. It was his practice to mix the solution and carry the bucket containing the solution from the engine out over the tender, which was his duty, and be ready to pour the solution when the train stopped. Then he was to open the manhole, pour the solution into the tank of the engine and pull down the spout and fill the tank of the engine with water. Plaintiff testified that on December 5, 1928, as he left the engine and started over the tender, it made a big sway back and forth, and the lurch threw him from the tender about fifteen or twenty feet on stony ground at the side of the track with such force that his body bounced about five feet from where it struck the ground, breaking both arms, one at the elbow of the left arm, and causing other severe injuries of a permanent character. There seems to be little if any

controversy as to the character and extent of his injuries. There was testimony that as the train approached the tank around a sharp curve on the side of a hill over the defective track, it was traveling at a speed of thirty miles an hour. The controversy between the parties at the trial centered largely on the condition of the track on the curve approaching the water tank at the side of the track.

Testimony was offered tending to show that the curve was six hundred feet long, and the track on it was laid about six feet from the edge of a bluff, and at times the water from above had moved the track; that there was a lack of ballast of the track, and that the section men had even used wet soil for the purpose of tamping, raising and adjusting the track; that many of the ties under the rails were rotten and some of them broken; that the track had slipped as much as five inches, and that when it was straightened by the section men, mud was tamped about the ties. There had been excessive rains just prior to the accident, weather records showing that 6.17 inches of rain had fallen during the month preceding the accident, and that trains passing over the curve rocked violently back and forth, especially when driven over the low joints in the track. Testimony was to the effect that the train entered the curve at a speed of thirty-five miles an hour and that when brakes were applied it was slowed down. The application of the brakes, it is claimed, caused the lurch of the tender which threw the plaintiff from the train.

There was great conflict in the evidence as to the condition of the track. Witnesses for the defendant stated that in fact there was nothing wrong with the track. The jury, as we have seen, found that it was "a bad track, bad ties and low joints."

Defendant insists that the plaintiff's evidence was insufficient to sustain the charge of defective track or excessive speed, and that negligence of the defendant was not established. Manifestly there was evidence tending to show that the track was defective and so defective as to warrant the finding that there was negligence in its maintenance, and that the fall and injury to plaintiff was the result of the negligence.

Among the witnesses produced by plaintiff was that of a section man who worked on the section which included the curve where the accident in question occurred. He had been working on that section from the middle of October, 1928, until the accident occurred on December 5, 1928. The day following he and other section men

were ordered to look after the track at the curve, and he said that the track was muddy, that it had slipped and was out of line five or six inches, both rails had slipped about two car lengths of the curve; that the outside rail was lower than the inner rail and should have been higher; that there was no ballast between the ties nor at the end of the ties; that it was just a swinging track, only the centers of the ties were resting on the ground; that many of the ties were rotten and the spikes which they drove in the ties would not hold; that about every fourth tie in the track was broken and that they had to shift the track back in line about five or six inches, and after raising and gauging the track had to tamp it with mud as they had no ballast to use. He further testified that the track was on a short curve on the side of the bluff and was very rough. He also said that it had been in that condition for two or three months, and in going back and forth over it on a motor or handcar, he found that it rocked back and forth both ways and was hard riding, as joints were open and low. He stated that he had lived in the community where this part of the track was located, and that it had been in the condition he described for two years and was in fact a skeleton track, with nothing to prevent it from slipping, and that the section gang had done no work on it during that time. There was other evidence tending to show the track was in bad condition. The express messenger on the train at the time of the injury noticed that the track was very rough on the curve, and there was an unusual swing to the cars of the train, so much so that express packages were knocked over and it seemed to be an unusual movement. There was testimony that the train went into the curve over the slipping and swinging track at a speed of thirty miles an hour and did not slow down until they were close to the water tank.

Taking the testimony as given, the defects and damages were obvious and could not escape the observation of the engineer and fireman if they were awake and in the performance of their duties.

Defendant contends that the evidence is insufficient, being mainly that of a single witness who is no longer in the employ of defendant and had removed to another state, and further that his testimony was given by deposition. It is insisted that his testimony was incredible, impossible and contrary to human experience. Of course, testimony may be rightly given by deposition, and no reason is seen why it may not be as truthful and convincing as though it had been given orally in court. The witness whose testimony is

challenged was cross examined at length by the defendant. It cannot be said that it is beyond human experience that a railroad track should become defective and dangerous, as described by the principal witness, and still be in operation, nor can we say against evidence that trains are not run over defective tracks or that there was no negligence in its management. The reports of our own decisions and those of other jurisdictions show that such instances do occur, and that the injury caused by bad railroad tracks and bad operation has been determined to be due to the negligence of operating railroad trains.

Testimony was offered by defendant contrary to that of the plaintiff as to the condition of the track and the dangers of traveling over it. The credence to be accorded to witnesses and the weight of the evidence was the exclusive function of the jury, and its findings, approved as they were by the trial court, founded upon conflicting evidence, is binding on this court. As so often stated and consistently followed, the court cannot on appeal weigh conflicting evidence or pass upon the credibility of witnesses. Certainly there was evidence that the track was defective. It is not open to controversy that it was the duty of the defendant to its employees to exercise reasonable care to make and keep its track fit and safe for use and if, through its negligence in this regard, it caused or contributed to an injury of its employee, it is liable to him unless he was himself negligent or had assumed the risk. It must therefore be held that there was evidence sufficient to sustain the finding of negligence in failing to maintain a fit and safe track, and that its negligence caused or contributed to plaintiff's injury.

We still have the question pressed by defendant that the plaintiff assumed the risk of the defective track. It appears that plaintiff had been employed by the defendant as a locomotive fireman or engineer for about seventeen years prior to the accident. For about eleven years he had been operating over the track and around this defective curve where the accident occurred. From October 24, 1928, to December 5, 1928, and the rainy season intervening between these dates, he had operated over the tracks twenty-seven times. He testified that during the eight years before the accident he traveled over this part of the track at least once each week and most of that time as engineer. He produced proof of the most perceptible defects, which no fireman could run over repeatedly without observing and understanding the dangers. To establish

negligence he offered evidence, as we have seen, that at the time of the accident the tracks on the curve were without ballast and, in fact, without a roadbed. That the track was slipping back and forth in the mud, and part of it out of line as much as five or six inches. He produced proof that the ties were rotten and broken and were lying in a foot of slick mud, and that when trains went over the low joints of the curve the cars rocked back and forth and had been doing so for four or five months before the accident. These conditions which he emphasized were so obvious and the dangers so manifest that they could not have escaped the attention of an experienced fireman, even one of low intelligence. Plaintiff was a railroad man of large experience, and while the defects might not have been noticed by him on one or a few trips over the dangerous curve, the defects had existed for a long time and he had run over them very many times. We think on his own proof that he knew of the danger incurred but had continued in the service and concluded to take the risk of the conspicuous defects and dangers.

In his testimony he said that he did not see anything wrong with the track. It looked to be as it usually had, nothing unusual or unsafe, and that he did not anticipate any danger in starting over the tender to carry his mixture to the water tank. Plaintiff contends that the risk is not assumed unless the injured person not only knows of the physical facts, but also knows and appreciates the danger. If the defects were of such character and plaintiff, in possession of his faculties, was brought in such relation to them that he could not escape knowledge of them, it is futile to contend that he did not see them nor recognize the danger. In *Clark v. Mo. Pac. Rly. Co.*, 48 Kan. 654, 29 Pac. 1138, a brakeman undertook to make a coupling between cars and was injured. He claimed the roadbed was defective and unsafe, but it appeared that the brakeman had worked on the track for more than a year, was familiar with the conditions of the roadbed, and it was held that—

"Where the servant has equal knowledge with the master of the construction and condition of the roadbed of a railroad company, and knows all the dangers and hazards incident to his work thereon, such servant assumes all the risks and hazards of his employment." (Syl. ¶ 1.)

In *Railway Co. v. Click*, 78 Kan. 419, 96 Pac. 796, the railway employee suffered an injury which caused his death, and assumption of the risk was involved. The employee was a switchman in the yards of the company, and the negligence charged was that the

company had permitted obstructions in the nature of cinders to remain in the yards, and that these caused the accident. He had worked for the company a number of years and was familiar with the obstructions and the condition of the railroad yards, including the fact that cinders were deposited along the tracks, and it was held that the switchman assumed the risk. It was contended that it must be proven that he had actual knowledge of the obstructions which caused the accident, and that it was not enough that he was familiar with the condition of the track at the time of his injuries. It was said:

"It is the ordinary rule that a person of full age and in possession of all his faculties, when brought in such relation to physical objects that he would naturally observe their presence, will be presumed to know and take cogniz-ance thereof; in other words, it is too much to require proof, under such cir-cumstances, that one actually did know such facts as a person ordinarily would know if placed in the same position." (p. 422.)

In *Briggs v. Railroad Co.*, 102 Kan. 441, 175 Pac. 105, a fireman left his train at a station to eat a lunch, and the train was started before he returned to the train. He chased after the train and climbed upon it, and while walking over the train stumbled and fell between the cars and was killed. He was an experienced rail-road man. The action brought, as here, was under the federal em-ployers' liability act, and it was held that he assumed the risk. The jury found that the deceased knew or should have known the risks and dangers which he would normally and necessarily encounter in walking over the moving train. Among other things, it was said:

"The danger, therefore, was the normal danger attending the way which the fireman chose of reaching his place on the engine of the moving train. This danger was perfectly obvious to anyone. The fireman had a right to assume that the engine would not be started until he was in the engine cab. It was started, however, without him. When he came out of the lunch room the engine and a number of cars had already gone by, and the train was going forward. He was immediately and manifestly confronted with all the diffi-culties and dangers to be encountered in reaching his place on the engine. It would be fatuous to say he was not aware of them, and it would be an im-peachment of the mental capacity of a competent man to say he did not appreciate them. . . . The whole situation created by the engineer's neg-ligence lay before the open eyes of this experienced trainman the moment he stepped out of the lunch room. He voluntarily chose his course, and voluntarily assumed the risk attending his choice." (pp. 445, 446. See, also, *McDougall v. Railway Co.*, 106 Kan. 135, 186 Pac. 1028.)

Knowledge of the risk is essential to the defense of assumption

of risk, and while the plaintiff in the present case now disclaims any knowledge of the risk, he has shown by his own proof that the danger was so plainly visible to one with his faculties that he could not have avoided observing it if he had exercised the slightest diligence. The accepted rule is that a man is charged with a knowledge of that which is plainly visible to him. He is chargeable with such knowledge as the reasonable exercise of his ordinary faculties would disclose, and if the defects complained of, on which the negligence of the railroad company is predicated, are so plainly visible that the fireman must have known of it unless he shut his eyes, he will be held to have known it and to have assumed the risk.

Here the jury was asked the question: "Was the condition of the track in question such that a person of ordinary care and prudence, under similar circumstances as the defendant, would anticipate danger or injury therefrom?" and its answer was "Yes." An experienced trainman should know and comprehend as much about defects in a railroad track as a person of ordinary care and prudence, and plaintiff cannot be permitted to stultify himself by saying he could not see what anyone in possession of his faculties could know and appreciate. In *Butler v. Frazee*, 211 U. S. 459, which involved the question of an assumption of risk by a workman in a laundry, who was injured in a mangle and claimed that she was not aware of the danger, the court said:

"The visible conditions may have been of recent origin, and the danger arising from them may have been obscure. In such cases, and perhaps others that could be stated, the question of the assumption of the risk is plainly for the jury. But where the conditions are constant and of long standing, and the danger is one that is suggested by the common knowledge which all possess, and both the conditions and the dangers are obvious to the common understanding, and the employee is of full age, intelligence, and adequate experience, and all these elements of the problem appear without contradiction, from the plaintiff's own evidence, the question becomes one of law for the decision of the court. Upon such a state of the evidence a verdict for the plaintiff cannot be sustained, and it is the duty of the judge presiding at the trial to instruct the jury accordingly." (p. 466.)

In *Choctaw, O. & G. R. Co. v. Holloway*, 191 U. S. 334, involving a like question, the court approved an instruction, saying:

"A man cannot shut his eyes and say he don't want to see anything which a reasonable man could not help but see if he keeps his eyes open. Now, if for that reason—that is, if the fact that there were not any brake shoes on that engine was obvious to any reasonably prudent man who runs on it as a fireman for several hours, as the evidence shows that plaintiff did for six hours,

from Hulbert to Brinkley, before he went back again before the accident happened—that is perfectly obvious to a man who is fireman and traveling for six hours (without hunting for it), then the court will tell you that he had knowledge of, and ought to have known it, and he is chargeable with it as if he had known it." (p. 337. See, also, *Jacobs v. Southern R. R.*, 241 U. S. 229; *Southern Pacific Co. v. Berkshire*, 254 U. S. 415.)

Many cases are cited in which the defense of assumed risk was not sustained, but these were controlled by circumstances differing from those of the present case, and upon the record we conclude that the plaintiff assumed the risk, and hence the judgment is reversed with directions to enter judgment for defendant.

HARVEY and SMITH, JJ., dissenting.