## PRYOR v. CHICAGO, R. I. & P. R. CO. R. Co.

No. 22982. Nov. 27. 1934.

Withdrawn, Corrected, Refiled, and Rehearing Denied Dec. 27, 1934.

Morrison, Morrison & Morrison and Ledbetter, Stuart, Bell & Ledbetter, for plaintiff in error.

W. R. Bleakmore, John Barry, W. L. Farmer, and Robert E. Lee, for defendant in error.

PER CURIAM. This action was commenced in the district court of Pottawatomie county, Okla., by Viola Pryor, as administratrix of the estate of her deceased husband, Cleve Pryor, against the Chicago, Rock Island & Pacific Railway Company, to recover damages for the death of her hus-

band while in the employ of the defendant. The trial court sustained a demurrer to plaintiff's evidence and dismissed the action, and the plaintiff appeals.

The action is based on the Federal Employers' Liability Act of 1908, 35 Stat. 65, c. 149, U. S. C., title 45, c. 2 (45 USCA sec. 51 et seq.) and the Federal Boiler Inspection Act, of 1911, 36 Stat. 913, sec. 2, as amended June 7, 1924, 43 Stat. 659, U. S. C. title 45, sec. 23 (45 USCA sec. 23). The defendant admits that it is a corporation operating a line of railway as a common carrier in interstate commerce, and concedes that the acts of Congress mentioned govern the case.

The amended petition of plaintiff alleges that the proximate cause of the death of plaintiff's decedent was the faulty operation of an injector on the locomotive of which he was fireman at the time of his death, it being alleged that the appliance mentioned was defective in violation of the Federal Boiler Inspection Act, and that the deceased, while leaning out of his cab window in an endeavor to get the alleged defective injector in good order, was struck on the head and instantly killed by girders on the side of a bridge on defendant's line of railroad. It is also alleged in the amended petition that a valve in the water tank in the tender of the locomotive was defective in that it was attached by means of a loose wire instead of bolts to a rod, which condition caused the valve to operate improperly and obstructed the flow of water from the tank through the injector into the boiler. It was also alleged that foreign substances had collected in the water tank, clogging the orifice through which the water flows into the injector and from thence into the boiler. It was further alleged by plaintiff that defendant was negligent and failed to provide a safe place of work for plaintiff's decedent by reason of the fact that there was a clearance of only 22 inches between the sides of the bridge on which the deceased was killed and the cab window of the locomotive on which he was riding, and that it was necessary for the deceased to lean out of the cab window at least 26 inches in order to observe the operation of the alleged defective injector, and that as he did so he was killed by being struck by the clearance on defendant's bridge.

The defendant answered by a general denial and by pleading that the deceased's death was caused solely by his own negligence and want of care, and pleading, further, assumption of risk with respect to the clearance on defendant's bridge.

The evidence on the part of plaintiff, in brief, is as follows:

Cleve Pryor, plaintiff's decedent, for many years prior to July 12, 1926, the date of his death, had been employed as a fireman by the Rock Island Railway Company. For several years he had been on the regular passenger run between Booneville, Ark., and Shawnee, Okla. On the morning of July 12, 1926, Fireman Pryor, plaintiff's decedent, and Engineer Martin, at Booneville, Ark., received engine No. 831, drawing westbound passenger train No. 111. The locomotive was equipped with two injectors of the type known as the "simplex," it appearing by the testimony of experienced railroad men that this type of injector is standard equipment. An injector on a locomotive is a device by which water is drawn from a water tank located in the tender by means of steam drawn into the injector from the boiler, which creates a vacuum, starting the water to run from the tank into the injector proper, and from thence it is forced into the boiler. On this locomotive there were two injectors, one located on the right or the engineer's side of the cab and the other on the left or the fireman's side, and the testimony is that all locomotives of that type are now so equipped with two injectors. It is usual for only one of the injectors to be used at a time. The engineer is charged with the duty of seeing that all appliances in his locomotive are properly operated and to see that the boiler is properly kept filled with water through the injectors. It was the practice on the Rock Island Railway Company and by Engineer Martin and Fireman Pryor to use generally the injector on the left side of the locomotive, which was operated by the fireman. When Engineer Martin and Fireman Pryor took the locomotive at Booneville, Ark., to start on their run to Shawnee, Okla., on the morning of the fatal accident, they made an inspection and found everything in good order. They particularly inspected and tested the injectors and found them working properly. Their train proceeded from Booneville to a place known as Penola about two miles east of Fourche Maligne bridge, which is located about three miles east of Wilburton, Okla. During all of this time Fireman Pryor was operating the injector on his side of the cab and the engineer was not using his injector. At the point about two miles east of the bridge, Pryor seemed to have difficulty in getting his injector to work, and Engineer Martin says Pryor called to him saying, "Billie, put on your injector." The engineer testified that he immediately put the injector on his side of the cab in operation.

He said that he then observed Fireman Pryor still working with his injector and says that he called to the fireman and said to him, "Leave the injector alone, Charley, and we will see what is the matter with it when we get to Wilburton." Pryor was leaning out of his cab window to observe an overflow pipe extending from the injector down through the cab floor and curving outward to the side of the locomotive underneath and back of the cab window. When the locomotive reached the bridge at Fourche Maligne and while the locomotive was on the bridge, Engineer Martin observed Fireman Pryor slumping back into the cab. The engineer immediately stopped the locomotive while still on the bridge and went to the assistance of the fireman. He found Pryor's head and face covered with blood, and ascertained that he had been killed instantly by being struck on the head, presumably by some object on the outside of the cab, and the engineer testified that it must have been one of the steel girders at the side of the bridge. The head brakeman was then placed on the engine as fireman and Engineer Martin ran the train to Wilburton, where the body of Pryor was taken off and placed in the baggage car. The train was then run a few miles further to Haileyville, where Engineer Martin was relieved by another engineer and fireman. At Haileyville, mechanics of the defendant railway company were called, and after an inspection of the injector on the fireman's side, finding it to be hot and not capable of being operated properly, this injector was removed and placed in the leg or pocket of the water tank in the tender. The injector on the engineer's side of the locomotive was then removed and placed on the fireman's side, and the train was then run into Shawnee where the injector that had been removed was taken to the machine shops of the defendant at Shawnee. Engineer Martin and other employees of the defendant railway company were called as witnesses by the plaintiff and testified that on the locomotive on which the fatal accident occurred, an overflow or discharge pipe extended downward from the injector through the floor of the locomotive cab and then curved outward to the edge of the locomotive so that the overflow or discharge from this pipe was thrown into the atmosphere. Several witnesses testified that a common method of ascertaining whether or not the injector was properly operating by drawing water from the tank in the tender through the appliance to be injected into the boiler was for the operator to observe whether there was any overflow or discharge of water and steam from the overflow pipe under the engine, it being tes-

tified that if there is a considerable overflow, it is an indication that the water is not being forced by the injector into the boiler. Several witnesses testified that this could be determined by hearing the water flowing through the injector and also by feeling the feed pipe underneath the injector. If this pipe was cool, it indicated that cold water was flowing through it. Engineer Martin testified that he always determined the proper operation of the injector by hearing and by sight in the manner stated, and he testified that it was not necessary to observe the overflow pipe for this purpose, but that many enginemen did use the method of observing the overflow, and that Fireman Pryor usually did that. Martin testified that this observation of the overflow pipe was made by many trainmen when the injector was put into operation to ascertain whether there was a proper flow of water, regardless of whether or not the appliance was out of order. Engineer Martin testified as follows:

"Q. I say, what is the occasion for the fireman to look out on the ground if he is trying to work his injector? A. No occasion whatever. Q. What does he do it for? A. Just kind of a force of habit with some of the boys."

All of the witnesses who testified concerning the operation of an injector stated that if the lever on the injector is pulled too far back, in the operation known as priming, too much steam will rush into the injector, causing it to overheat, and that when it is too hot it will not operate properly and will not draw water from the water tank and inject it into the boiler. Several witnesses testified that a common method of heating engine cabs in cold weather is to pull the lever of the injector far back, causing the appliance to heat quickly and to radiate the heat into the cab. When so heated the injector will not function in forcing water from the tender tank into the boiler. There was offered in evidence by the plaintiff a part of the records in the office of the master mechanic of defendant at Shawnee, purporting to be a locomotive inspection report made by William Martin, the engineer of the locomotive on which Fireman Pryor was killed, made on the day of the accident. This report was not admitted in evidence and we think its exclusion at the time it was offered was proper. The action of the trial court in excluding this evidence is not assigned as error by the plaintiff, but it is set forth as error in the motion for a new trial. Later on, in the course of the testimony, Engineer Martin was permitted to testify concerning this inspection report, and it was admitted by counsel for the defendant that

he made the report. To all intents and purposes, therefore, the report as offered in evidence was before the court and jury, although the document itself, after the order excluding it, was not again offered in evidence by the plaintiff. This was the report required to be made by an engineer after each run. Engineer Martin was permitted to testify concerning certain entries in this report. Under the heading, "Repairs Needed," the report contained the following entries: "1. Repair right injector." "7. Make tight joints in left injector, when getting air don't take up all water." In his testimony concerning this report Engineer Martin stated that he did not examine the left injector after he left the train at Haileyville; that his report was simply a notation of what he believed the machinists and the inspector ought to check up on; that Mr. Pryor had told him that the left injector was working properly; that he did not know the cause, if any, of its improper working and had made no inspection whatever of the device himself. Melvin Lund, another engineer in the employ of the defendant, testified that four or five days before the day of Pryor's death, he was the engineer on engine No. 831, the same locomotive on which Pryor met his death, and that on that occasion, four or five days before Pryor's death, the fireman on the engine who was working the injector "had some trouble to get it primed." No evidence whatever was offered by the plaintiff relative to foreign substances in the tender water tank or to the effect that the valve in the water tank was not properly attached to its rod on the day of the accident. The fact that the engineer's injector, when it was changed to the fireman's side, worked properly when it was applied, seems to negative any assumption that the orifice in the water tank was clogged or that there was any defect in the connection between the water tank and the injector. Charles W. Coulter, another engineer, testified that three days after the death of Pryor, and on July 15, 1926, he ran the same locomotive on which Pryor was killed, from Shawnee, Okla., to Booneville, Ark., and that on that day the tank valve became disconnected. He testified as follows:

"A. I had that engine. After we left down here, between here and Haileyville, I had a little trouble. The tank valve became disconnected. Q. All right. Did that in turn cause that injector to fail to work? A. The tank valve became disconnected and we couldn't get any water to the injector. That happens often. Q. When you couldn't get any water to the injector, did that cause the injector to do anything? A. We just didn't

try to work it. Q. What did the injector do with reference to whether or not it heated? A. It didn't do anything because when we found the valve disconnected, we didn't try to work it."

This testimony was relative to a condition found three days after the accident and after the locomotive had been inspected in the shops at Shawnee, according to the testimony. No evidence whatever was offered by the plaintiff as to the clearance between the bridge sides and the locomotive cab at the time of the accident, nor was there any evidence as to how far the body of the deceased fireman protruded from the cab window when he was observing the overflow pipe. Engineer Martin said it was only necessary to protrude the head about six inches from the cab window to see the overflow pipe. Counsel for plaintiff in their brief admit that there was no evidence that the bridge did not have sufficient clearance and this question appears to be entirely eliminated from the case, it being stated in the reply brief of plaintiff that, "While it is true that plaintiff's petition did plead negligence on the part of the defendant railroad in maintaining a bridge with insufficient clearance, the case was actually tried on the theory that the railroad was liable solely because of the violation by the defendant of the terms of the Boiler Inspection Act." There is no testimony of any person who inspected the alleged defective injector or who knew of its condition after the death of Fireman Pryor, except the mechanic who changed the injectors at Haileyville, whose testimony is only to the effect that he found the injector hot. The same witness testified that a number of things would cause this heated condition, but he did not testify that he knew what did cause it. He made no inspection of the mechanism of the appliance, but simply removed and installed the other injector in its place. The evidence with respect to the condition of the injector and its operation consists only of what Engineer Martin saw Fireman Pryor doing with it, and the statement of Pryor to Martin a short time before the accident that the injector would not work, and the fact that the injector was hot when the train arrived at Haileyville, and the testimony of several railroad men who were used as experts, relative to the different things that might have caused the heating of the injector. It was stated that a defect in the mechanism of the injector or some of its connections or a clogging of the water tank might cause overheating, and all of these witnesses testified that a very common cause of overheating was improper manipulation by the operator; that overheating

merely causes a temporary incapacity to work properly, and there is no testimony whatsoever that the overheating of one injector or its entire failure to work would render the appliance unsafe or would impair the safe and efficient operation of the locomotive. On the other hand, it was testified that the installation of two injectors was made so that if one failed to work, the other could be used. That was done in this case when Engineer Martin turned on his injector at the request of Fireman Pryor.

Plaintiff, in her amended petition, pleaded certain rules and regulations of the Interstate Commerce Commission pertaining to the inspection and testing of steam locomotives and tenders and their appurtenances, these being Rule 43, relating to injectors, and Rule 153, relating to feed water tanks. These rules and regulations were not introduced in evidence. Neither the federal courts nor state courts take judicial notice of the rules and regulations promulgated by the Interstate Commerce Commission pertaining to the Federal Employers' Liability Act and the Federal Safety Appliance Act, Robinson v. Baltimore & O. R. Co., 222 U. S. 506, 56 L. Ed. 288, and Thompson v. Missouri Pacific R. Co., 15 F. (2d) 28. However, there is nothing in the evidence to show that there was a violation by the defendant of either of these rules and regulations, which are set forth in the amended petition of plaintiff.

The applicable portions of the Federal Employers' Liability Act and the Federal Boiler Inspection Act, upon which this action is based and upon which plaintiff relies, are as follows:

"That every common carrier by railroad while engaging in commerce between any of the several states or territories, or between any of the states and territories, or between the District of Columbia and any of the states or territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative. for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars. engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." Act April 22, 1908, c. 149, sec. 1, 35 Stat. 65.

"That in all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee; Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." Act April 22, 1908, c. 149, sec. 3, 35 Stat. 66.

"That in any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." Act April 22, 1908, c. 149, sec. 4, 35 Stat. 66.

"That it shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 28, 29, 30 and 32, and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." Act June 7, 1924, c. 355, sec. 2, 43 Stat. 659.

This action being based upon the United States statutes, supra, the decisions of the federal courts construing those statutes relative to the kind and amount of evidence required in order to render the carrier liable in damages to an employee, are controlling. Spinden v. Railway Co., 95 Kan. 474, 148 P. 747; Roebuck v. Railway Co., 99 Kan. 544, 162 P. 1153, L. R. A. 1917 E. 741; Gulf, C. & S. F. R. Co. v. Scroggins, 161 Okla. 294, 18 P. (2d) 873; St. L. & S. F. R. Co. v. Snowden, 48 Okla. 115, 149 P. 1083.

In the case of Gulf, Mobile & N. R. Co. v. Wells, appealed from the Supreme Court of Mississippi, 275 U. S. 455, 72 L. Ed. 370, it

was said by the Supreme Court of the United States:

"It is unquestioned that Wells was at the time employed in interstate commerce, and that the case is controlled by the Federal Employers' Liability Act. Hence, if it appears from the record that under the applicable principles of law as interpreted by the federal courts, the evidence was not sufficient in kind or amount, to warrant a finding that the negligence of the engineer was the cause of the injury, the judgment must be reversed. Seaboard Air Line R. Co. v. Padgett, 236 U. S. 668, 673, 59 L. Ed. 777, 781, 35 Sup. Ct. Rep. 481; Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S. 472, 474, 70 L. Ed. 1041, 1043, 46 Sup. Ct. Rep. 564."

And in the Wells Case, supra, after reviewing the evidence, it is said:

"In short, we find that on the evidence and all the inferences which the jury might reasonably draw therefrom, taken most strongly against the railway company, the contention that the injury was caused by the negligence of the engineer is without any substantial support. In no aspect does the record do more than leave the matter in the realm of speculation and conjecture. That is not enough. Patton v. Texas & P. R. Co., 179 U. S. 658, 663, 45 L. Ed. 361, 364, 21 Sup. Ct. Rep. 275; Chicago, M. & St. P. R. Co. v. Coogan, supra, 478 (70 L. Ed. 1045, 46 Sup. Ct. Rep. 564.)"

In the case of Roebuck v. A., T. & S. F. R. Co., 99 Kan. 544, 162 P. 1153, it is held that:

"In determining what constitutes negligence of the carrier in trials under the Federal Employers' Liability Act, the original common-law rules are to be applied, except where those rules are, by the terms of the act, abrogated, qualified or restricted; and, in case of any conflict between the state and federal courts as to what constitutes negligence, the case is controlled by the common law as interpreted and applied in the federal courts."

It is said in the case of Hardy-Burlingham Mining Co. v. Baker, 10 Fed. (2d) 277:

"The rule prevailing in some jurisdictions that any evidence having any legal tendency to prove the point is enough to require the court to submit that point to the jury was, 50 years ago, denied by the Supreme Court in Commissioners v. Clark, 94 U. S. 278, 24 L. Ed. 59, where the 'scintilla' rule is expressly disapproved."

In the case of Patton v. Texas & P. R. Co., 179 U. S. 658, 45 L. Ed. 361, Mr. Justice Brewer made the following observations:

"The fact of the accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. Texas & P. R. Co. v. Barrett, 166 U. S. 617, 41 L. Ed. 1136, 17 Sup. Ct. Rep. 707. * * * It is not sufficient for the employee to show that the employer may have been guilty of negligence; the evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony; and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs."

The decision in the Patton Case, supra, was prior to the enactment of the Federal Employers' Liability Act and the Federal Boiler Inspection Act, but the rule announced in that case with reference to determining the sufficiency of evidence to show negligence on the part of an employer, has been consistently followed in all later cases in the federal courts involving a construction of those acts.

It is said in the case of Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S. 472, 70 L. Ed. 1041:

"By the Federal Employers' Liability Act, Congress took possession of the field of employers' liability to employees in interstate transportation by rail; and all state laws upon that subject were superseded. Second Employers' Liability Case (Mondou v. New York, N. H. & H. R. Co.), 223 U. S. 1, 55, 56 L. Ed. 327, 348, 38 L. R. A. (N. S.) 44, 32 Sup. Ct. Rep. 167, 1 N. C. C. A. 875; Seaboard Air Line Co. v. Horton, 233 U. S. 492, 501, 58 L. Ed. 1062, 1068, L. R. A. 1915 C, 1, 34 Sup. Ct. Rep. 635, Ann. Cas. 1915B, 475, 8 N. C. C. A. 834. The rights and obligations of the petitioner depend upon that act and applicable principles of common law as interpreted by the federal courts. The employer is liable for injury or death resulting in whole or in part from the negligence specified in the act and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to control of the several states. This court will examine the record, and if it is found that, as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be

164

reversed. St. Louis, I. M. & S. R. Co. v. McWhirter, 229 U. S. 265, 277, 57 L. Ed. 1179, 1186, 33 Sup. Ct. Rep. 858; New Orleans & N. E. R. Co. v. Harris, 247 U. S. 367, 371, 62 L. Ed. 1167, 1170, 38 Sup. Ct. Rep. 535; New Orleans & N. E. R. Co. v. Scarlet, 249 U. S. 528, 63 L. Ed. 752, 30 Sup. Ct. Rep. 369. * * * It is the duty of the trial judge to direct a verdict for one of the parties when the testimony and all the inferences which the jury reasonably may draw therefrom would be insufficient to support a different finding. Baltimore & O. R. Co. v. Groeger, 236 U. S. 521, 524, 69 L. Ed. 419, 422, 45 Sup. Ct. Rep. 169. When the evidence and the conclusions which a jury might fairly draw from the evidence are taken most strongly against the petitioner, the contention of the respondent that the bent pipe caused or contributed to cause the death is without any substantial support. The record leaves the matter in the realm of speculation and conjecture. That is not enough. Pawling v. United States, 4 Cranch, 219, 221, 2 L. Ed. 601, 602; Patton v. Texas & P. R. Co., 179 U. S. 658, 663, 45 L. Ed. 361, 364, 21 Sup. Ct. Rep. 275; Looney v. Metropolitan R. Co., 290 U. S. 480, 488, 50 L. Ed. 564, 569, 26 Sup. Ct. Rep. 303, 19 Am. Neg. Rep. 627; St. Louis, I. & M. R. Co. v. McWhirter, supra, 282, (57 L. Ed. 1187, 33 Sup. Ct. Rep. 858); St. Louis-San Francisco R. Co. v. Mills, 271 U. S. 344, ante, 979, 46 Sup. Ct. Rep. 520, decided May 24, 1926. Judgment reversed."

Testing the evidence in this case on the part of the plaintiff by the rules laid down in the federal court decisions, supra, the question as to whether the injector and its appurtenances on the locomotive on which Fireman Pryor was killed were defective, is a matter of surmise and conjecture. The appliances may or may not have been in perfect mechanical condition. The failure of the injector to work properly may or may not have been due to improper manipulation by the deceased. No witness has testified that he knew that either one of these facts existed. The only inference that may reasonably be drawn from the entire testimony is that the failure of the injector to work properly in the hands of the deceased may possibly have been due to a mechanical defect in the appliance, or some of its parts or connections, or it may have been due to improper manipulation by Fireman Pryor. The duty of the defendant railway company under the Boiler Inspection Act was to furnish for the use of the deceased a locomotive, boiler, tender, and all parts and appurtenances that were in proper condition and safe to operate without unnecessary peril to life or limb, and to have the locomotive, its parts and appurtenances inspected from time to time in accordance with the provisions of the act.

We quote from the decision in the case of Erie R. Co. v. Lindquist, 27 F. (2d) 98, which reviews the authorities and definitely discloses the purposes and limitations of the several acts of Congress applicable to this case, in which decision it is said:

"But in all cases under these statutes that have come to our attention, performance is complete and liability thereunder ends when the carrier has observed their requirements by supplying and maintaining in operative condition the safety appliances required. We have not found any court, construing such statutes, that has held they extend liability to a carrier when its servants negligently operate safety devices properly supplied and properly maintained."

If the locomotive in question was rendered unsafe to operate because of a defective injector or other parts of the locomotive, and if such defective condition was a contributing proximate cause of the death of Fireman Pryor, he cannot be held to have been guilty of contributory negligence, nor to have assumed the risks of his employment, and the defendant would be liable in damages on account of his death. These are the only questions to be determined on this appeal. The question of negligence on the part of defendant on account of the alleged insufficient clearance on the bridge is eliminated by an entire want of evidence on that point. The plaintiff having admitted that there is no such evidence and having stated that the case was tried on the theory that the railway company was liable because of its violation of the Boiler Inspection Act.

We cannot agree with plaintiff's contention that since the duty of the railway company was absolute to keep the appliance in proper condition, a failure of the appliance to work properly is sufficient proof of a violation of the Boiler Inspection Act. Both sides say that the doctrine of res ipsa loquitur does not apply in this case, and we think that it does not.

The testimony does show that Fireman Pryor was having trouble with the injector on his side of the cab, but this difficulty might have been caused by his improper manipulation of the appliance in jerking the lever back too quickly or too far in priming. The fact that the injector was found to be hot when the change of injectors was made at Haileyville, does not necessarily indicate that the injector was mechanically defective. Pryor was manipulating the injector at the time of the accident and undoubtedly had the lever pulled back to admit steam from the boiler at the moment of his death, for at that time

he was looking out of the cab window to observe the overflow pipe. Engineer Martin testified that he did not touch the injector on the fireman's side of the cab after Pryor's death, and he ran the train to Haileyville, a distance of about 22 miles, using the other injector. There is no testimony as to whether the lever on the fireman's injector was pulled back or was closed when the locomotive arrived at Haileyville, but the injector was there found to be too hot to operate properly.

It was wholly unnecessary and highly dangerous for the deceased to protrude his head and body from the engine cab to observe the overflow pipe and so determine whether or not the injector was working properly. Nearly all of plaintiff's witnesses testified that fact may be ascertained by the sound of the water flowing from the injector into the boiler or by feeling the pipe below the injector. Engineer Martin testified that he always used those methods. It is clear that the appliance was so constructed that it might have been employed in actual service without unnecessary peril to life or limb, and that the locomotive being equipped with two injectors was not rendered unsafe to operate with one of the injectors entirely out of commission.

We are of the opinion that the plaintiff's evidence and all reasonable inferences and conclusions to be drawn therefrom, are insufficient to show that the defendant violated any provision of the Federal Boiler Inspection Act, even if it be conceded that the testimony is sufficient to show that the injector that was being operated by Pryor was mechanically defective and would not function with proper manipulation. That would not have rendered the locomotive unsafe to operate. It was being safely operated at the time of Pryor's death with the injector on his side of the cab inactive in its proper functions, and, according to the testimony, the locomotive could have been operated indefinitely without peril to life or limb, so long as one injector was efficient and was keeping the boiler supplied with water. There is nothing inherently unsafe about a hot injector unless it should cause an injury by burning, which did not occur in this case.

But, if it be conceded that the testimony is sufficient to show that the injector in question was mechanically defective and that the locomotive was thereby rendered unsafe to operate, it was further incumbent upon the plaintiff to show that the defective condition of the appliance was a contributing proximate cause of the death of

the deceased within the meaning of the Federal Employers' Liability Act.

The Supreme Court of the United States, in construing the Employers' Liability Act and the Safety Appliance Act has several times declared that negligence on the part of the carrier or violation of the Safety Appliance Act by it must be a proximate cause of the injury to enable the employee to recover damages. Louisville & N. R. Co. v. Layton, 243 U. S. 617, 61 L. Ed. 931; St. L. & S. F. R. Co. v. Conarty, 238 U. S. 243, 59 L. Ed. 1290; Lang v. New York Cen. R. Co., 255 U. S. 455, 65 L. Ed. 729. In some of the federal court decisions the term "concurring proximate causes" is used, as in the case of Auchenbach v. Philadelphia & R. R. Co., 8 F. (2d) 350, cited in plaintiff's brief, in which it is said:

"Where plaintiff's contributory negligence and defendant's violation of a provision of the Safety Appliance Act are concurring proximate causes, the Employers' Liability Act requires the former to be disregarded."

Counsel for plaintiff apparently concede that the alleged violation of the Boiler Inspection Act must have been a concurring and contributing proximate cause of the death of plaintiff's decedent in order that defendant may be held liable in damages for the death, and they argue that a violation of that statute **was** a concurring proximate cause of the death.

Unquestionable the immediate cause of Fireman Pryor's death was a blow on the head by some object, presumably a girder on the bridge, while he was leaning out of his cab window. Was the condition of the injector, however that condition may have arisen, a contributing and concurring proximate cause of his death?

In the case of St. Louis & S. F. R. Co. v. Snowden, 48 Okla. 115, 149 P. 1083, it is said:

"There must be a causal connection between the negligence averred and the injury suffered to entitle plaintiff to recover; and this rule is so well established that it is unnecessary to support same by authority."

The mere fact that a defective condition of a locomotive, which is a violation of the Boiler Inspection Act, exists at the time of an injury which occurs on that locomotive, does not render the carrier liable for the injury. It is even not enough to charge the carrier with liability that the injury would not have resulted had there been a compliance with the act. There must be a

causal relationship between the violation of the act and the injury.

"A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated and efficient cause of the injury, even though such injury would not have happened but for such condition or occasion. If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause." 45 C. J. p. 931, par. 491.

An application of this rule is found in the case of St. Louis & S. F. R. Co. v. Conarty, 238 U. S. 243, 59 L. Ed. 1290, and Lang v. New York Cen. R. Co., 255 U. S. 455, 65 L. Ed. 729, in which cases the facts are similar. In each case there was a defective freight car not equipped with coupler attachment and bumpers standing on a side track. In one case a switch engine and in the other a string of switched cars collided with the defective car, and an employee of the railroad company was injured. The defective condition of the standing car where the impact was, contributed to the injury, and it was contended in each case that the failure to supply proper equipment on the standing car was the proximate cause of the injury. In both of these cases the Supreme Court held that although the injury to the employee would not have happened had the standing car been properly equipped with the safety devices required by the Safety Appliance Act, yet the defective condition of the car was not the proximate cause of the injury and that the employee could not recover. In the Lang Case, supra, the Supreme Court of the United States affirmed the decision of the Court of Appeals of New York reversing a judgment in favor of the employee for damages in the trial court and an affirmance of that judgment by an Appellate Division of the Supreme Court of New York, and said:

"The statement that 'owing to the abscence of the coupler attachment and bumpers on the crippled car intestate's leg was caught between the ends of the two cars' is disputed as a consequence or element of decision independently of what Lang was to do and did—indeed, it is the dispute in the case. Based on it, however, and the facts recited, the contention of petitioner is that they demonstrate a violation of the Safety Appliance Act and justify the judgment of the trial court, and its affirmance by the Appellate Division. For this Louisville & Nashville R. R. Co. v. Layton, 243

U. S. 617, is cited. The opposing contention of respondent is 'the proximate cause of the accident was the failure of the deceased to stop the cars before they came into collision with the defective car. The absence of the coupler and draw bar was not the proximate cause of the injury, nor was it a concurring cause.' To support the contention, St. Louis & San Francisco R. R. Co. v. Conarty, 238 U. S. 243, is adduced."

The court, after commenting on the evidence in the Conarty Case, supra, continues, in the Lang Case, supra:

"That case, therefore, declares the same principle of decision as the court of appeals declared in this; and, while there is some difference in the facts, the difference does not exclude the principle. In neither case was the movement of the colliding car directed to a movement of the defective car. In that case, the movement of the colliding car was at night, and it may be inferred that there was no knowledge of the situation of the defective car. In this case the movement of the colliding car was in the daytime, and the situation of the defective car was not only known and visible, but its defect was known by Lang. He therefore knew that his attention and efforts were to be directed to prevent contact with it. He had no other concern than to avoid it. 'It was not,' the trial court said, 'the intention of any of the crew (of the colliding car) to disturb, couple onto, or move the crippled car.' It was the duty of the crew, we repeat, and immediately the duty of Lang, to stop the colliding car, and to set the brakes upon it, 'so as not to come in contact with the crippled car,' to quote again from the trial court. That duty he failed to perform, and if it may be said that notwithstanding he would not have been injured if the car collided with had been equipped with draw-bar and coupler, we answer, as the court of appeals answered, 'Still, the collision was not the proximate result of the defect.' Or, in other words, and as expressed in effect in the Conarty Case, that the collision under the evidence cannot be attributable to a violation of the provisions of the law, 'but only had they been complied with, it (the collision) would not have resulted in the injury to the deceased.' Judgment affirmed."

Counsel for plaintiff in this case cite and rely upon decisions in the cases of Louisville & N. R. Co. v. Layton, 243 U. S. 617, 61 L. Ed. 931, and Minneapolis & St. L. R. Co. v. Gotschall, 244 U. S. 66, 61 L. Ed. 995. The decision in the Layton Case is extensively quoted in the Lang Case, supra, which distinguishes between the facts in the two cases. In a dissenting opinion in the Lang Case, Mr. Justice Clarke, the author of the opinion in the Layton Case, took

occasion to say that if the decision of the Lang Case were to stand,

"* * * it would seem that the orderly and intelligible administration of justice required that the principle of the Layton and Gotschall Cases should be disavowed or overruled, for that principle is so plainly in conflict with the opinion in this case that courts and advising counsel will otherwise be left without any rule to guide them in the disposition of the many similar cases constantly pressing for disposition."

A majority of the Supreme Court, however, considered that there was no conflict in the Layton and Lang decisions, but only a difference in the facts, requiring an application of the same rule relating to necessity for causal relationship between the fact of delinquency and the fact of injury. This is plainly shown by the following language in the decision in the Lang Case, supra, referring to the Layton Case, supra:

"Its concluding words are, expressing the condition of liability, 'that carriers are liable to employees in damages whenever the failure to obey these safety appliance laws in the proximate cause of injury to them when engaged in the discharge of duty.' The plaintiff recovered because the case came, it was said, within this interpretation of the statute."

There is no conflict in the statement of principle in the several United States Supreme Court decisions of the rule of proximate cause, but, depending on different states of facts, applying the same rule, recovery by the employee has been permitted in some cases and in others it has been denied. The rule is again stated by the Supreme Court in the case of Davis v. Wolfe, 263 U. S. 239, 68 L. Ed. 284, where a judgment of recovery was affirmed, the court saying, in commenting on the Layton, Gotchall, Conarty and Lang Cases, supra:

"The rule clearly deducible from these four cases is that, on the one hand, an employee cannot recover under the Safety Appliance Act if the failure to comply with its requirements is not a proximate cause of the accident which results in his injury, but merely creates an incidental condition or situation in which the accident, otherwise caused, results in such injury; and, on the other hand, he can recover if the failure to comply with the requirements of the act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designed to furnish him protection."

In the case of Thomas v. Maine Cen. R. Co. (Me.) 144 Atl. 212, the plaintiff's decedent, an engineer, stopped his train to investigate a hot box on the tender of his locomotive. He raised the lid of the journal box and flames darted out toward him. He quickly stepped back toward the eastbound track and was struck by a passenger train and instantly killed. It was there contended that the defective journal box was the proximate cause of the injury. The Supreme Judicial Court of Maine, passing upon this contention, said:

"The record plainly shows that a hot box on a locomotive engine or on its trailer, would not alone produce conditions which would make the engine and its appurtenances such that it could not be used without 'unnecessary peril to life or limb,' In other words, the condition of the locomotive was not the sole proximate cause of the injury. Was that condition, under the circumstances in this case, a contributing proximate cause of the injury? A contributing cause is one which, under the same circumstances, would always be an element aiding in the production of the accident. Broschart v. Tuttle, 58 Conn. 1, 17, 21 A. 925, 929, 11 L. R. A. 33, 38. This definition has received judicial sanction, is plain and sound. Under the burden impressed upon the plaintiff, to show that the defendant was guilty of a breach of duty, it was necessary for her to first prove that the condition of the locomotive was such that, under the same circumstances, it would always be an element aiding in the production of the accident, in order to satisfy the definition of contributory causes above given. This she has failed to do. It was also necessary for her to prove that the condition of the locomotive was the proximate cause of the injury. Proof that such condition was only a remote cause would be insufficient."

While the observations of the Supreme Court of Kansas, in the case of McDougall v. A., T. & S. F. R. Co., 186 P. 1028, quoted in the brief of defendant in error, are probably obiter dicta, because of the fact that the decision was on another phase of the case, and the question of a defective appliance was raised for the first time in the appellate court, yet, since the facts in that case are so nearly like those in the instant case, and because we believe that the statement of law as applied to the facts in that case is correct and exactly applies in the instant case, we refer to and quote from the decision in the Kansas Case, supra. The plaintiff's decedent in that case, an engineer, passed from his side of the cab to the fireman's side and was looking out and back toward a second locomotive that he was towing, which had a hot box. While looking back at the hot box on the second engine, the train passed over a covered

bridge. The engineer was struck on the head by a girder of the bridge and was instantly killed. The engineer in that case knew of the presence of the bridge and had run over the same track for several years. The court held, under the authority of federal court decisions, that the engineer assumed the risk with respect to the bridge clearance. In the Supreme Court the contention was made that the second engine was in a defective and unsafe condition and was being repaired at the very time the engineer leaned out of the gangway to look at the hot box; that the locomotive was being used in violation of the Federal Boiler Inspection Act, and therefore the decedent did not assume any risk for any injury he received, directly or indirectly, on account of the movement of such engine. The court said, in regard to that contention:

"There is no merit in the contention. If the point had been raised below, and if it could be said that the hot box on engine No. 500 made that engine a defective engine within the meaning of the act upon which plaintiff now seeks to rely, it must be obvious that the defect was in no respect the cause of the death of Paul McDougall. It was neither the proximate cause, nor did it have anything to do with his head coming in contact with the bridge girder. The proximate cause of his death was his negligent act in leaning out of the engine cab while passing through the bridge."

We have read and carefully considered the numerous cases cited and relied upon by plaintiff, as authority for the proposition that in the instant case a defective condition of the injector on Fireman Pryor's locomotive was a contributing proximate cause of his death, and in all of the federal decisions cited, in which a recovery by the employee was permitted, we are able to distinguish between the facts in those cases and the facts in this case. The statement of the law in all of the cases is the same, but, applying the same rules, the decision differs in the several cases according to the varying state of facts found to exist.

Under the testimony in this case Fireman Pryor would have looked out of his cab window to see whether steam or water was escaping from the overflow pipe if the injector had been in perfect condition. The testimony is that it is always necessary to know, when starting an injector to work, that the water is being drawn through the injector into the boiler. Fireman Pryor always ascertained that fact by looking out of his cab window down towards the overflow pipe. This was wholly unnecessary and dangerous. It cannot be said that the condi-

tion of the injector caused him to protrude his head and body from his cab window at the time of the fatal accident.

The rule in the federal courts in testing the sufficiency of the evidence of a plaintiff when challenged by demurrer is that the evidence and all the inferences that may reasonably be drawn therefrom shall be taken most strongly against the demurrant. Gulf, M. & N. R. Co. v. Wells, 275 U. S. 455, 72 L. Ed. 370; Baltimore & O. R. Co. v. Groeger, 266 U. S. 521, 69 L. Ed. 419; Chicago, M. & St. P. R. Co. v. Coogan, 271 U. S. 472, 70 L. Ed. 1041.

The rule in Oklahoma, as stated in the syllabus by the court in the case of Harris v. Tucker et al., 147 Okla. 210, 296 P. 397, is as follows:

"A demurrer to the evidence admits all the facts which the evidence in the slightest degree tends to prove and all inferences and conclusions that may reasonably and logically be drawn therefrom, but when such test on demurrer is applied to the evidence of plaintiff and found to support the decision of the trial court, its judgment must be sustained."

If there is any substantial difference in these rules, that of our Supreme Court is perhaps more favorable to the plaintiff in this case. We think that the decisions of the Supreme Court of the United States relative to the kind and amount of evidence required to establish liability of the railway company and the duty and functions of the trial court with respect to determining the sufficiency of the evidence when challenged by a demurrer, are controlling in this case. But, tested either by the rule in the federal courts or by the Oklahoma rule, we are constrained to hold that plaintiff's testimony in this case was insufficient to show a violation by the defendant of the Federal Boiler Inspection Act, and, further, that the evidence is insufficient to show a causal connection between the condition of the appliance in question, whatever that condition may have been, or however it may have arisen, and the death of plaintiff's decedent.

In the second syllabus paragraph to the case of Chicago, R. I. & P. Ry. Co. v. Duran, 38 Okla. 719, 134 P. 876, it is said:

"Under section 6 of article 23 of the Constitution (section 355, Williams' Ann. Const. Okla.), the question of contributory negligence or assumption of risk in all cases is a question of fact at all times to be left to the jury, but this provision does not relieve the party suing for damages for an alleged injury from the burden of proving that the injury was the proximate result of

negligence on the part of the party sought to be charged.

"(a) Where there is no evidence reasonably tending to show that such party sought to be charged was guilty of negligence, it is error for the trial court to submit such issues to the jury."

The question of contributory negligence and assumption of risk are not involved in the issues or in the evidence presented in this case, and the provisions of the Oklahoma Constitution requiring a submission of those questions to a jury do not apply.

The judgment of the district court of Pottawatomie county, Okla., sustaining the demurrer to plaintiff's evidence and dismissing the action, is affirmed.

The Supreme Court acknowledges the aid of Attorneys E. A. Burke, Bascom Coker, and L. C. Gossett in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of the law and facts was prepared by Mr. Burke and approved by Mr. Coker and Mr. Gossett, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.