LANG, ADMINISTRATRIX OF LANG, v. NEW YORK CENTRAL RAILROAD COMPANY.

CERTIORARI TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 290.   Argued March 1, 1921.—Decided March 28, 1921.

1. Failure of a railroad to equip a car with automatic couplers as required by the Safety Appliance Act will not render it liable to an employee for an injury of which the delinquency was not the proximate cause.  P. 458.
2. Where a brakeman, whose duty and purpose were to stop a string of switched cars before they reached a car standing on a siding awaiting unloading, was injured in a collision with it, having failed to stop the moving cars in time, *held*, that the fact that the standing car lacked a draw bar and coupler on the end where the impact was did not render the railroad liable for the injury, even if their presence would have prevented it, since the purpose of the requirement of automatic couplers is to avoid risks in coupling and not to provide a place of safety between colliding cars.  P. 459.

227 N. Y. 507, affirmed.

THE case is stated in the opinion.

Mr. Hamilton Ward, with whom Mr. Julius A. Schrieber and Mr. Irving W. Cole were on the brief, for petitioner.

Mr. Maurice C. Spratt for respondent.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Action for damages laid in the sum of $50,000 for injuries sustained by petitioner's intestate, Oscar G. Lang, while assisting in switching cars at Silver Creek, N. Y. The injuries resulted in death. The Safety Appliance Act is invoked as the law of recovery.

There was a verdict for $18,000 upon which judgment was entered. It and the order denying a new trial were affirmed by the Appellate Division, March 5, 1919, by a divided court.

The Court of Appeals reversed the judgments and directed the complaint to be dismissed, to review which action this certiorari is directed.

In general description the court said: "In the case before us the defendant [respondent] was engaged in interstate commerce. A car without drawbar or coupler was standing on the siding. The plaintiff's intestate was a brakeman and was riding on a second car kicked upon the same siding. A collision occurred and the deceased was crushed between the car upon which he was riding and the defective car."

There is no dispute about the facts; there is dispute about the conclusions from them. We may quote, therefore, the statement of the trial court, passing upon the motion for new trial, as sufficient in its representation of the case. It is as follows: "The defendant had a loaded car loaded with iron which had been placed on a siding at the station at Silver Creek, New York. On the same track was also standing another car destined for Farnham the

next station east. At Silver Creek this wayfreight had
orders to leave a couple of cars and to take on the car going
to Farnham. The car loaded with iron above referred to
was defective. The draw bar, the draft timber and the
coupling apparatus on the westerly end of this car were
gone. This car had been on the siding at Silver Creek
several days loaded with iron consigned to a firm at Silver
Creek, waiting to be unloaded. Its condition was known
to the crew of the wayfreight generally and to the plain-
tiff's intestate prior to the accident. In fact its crippled
condition was the subject of conversations between him
and the train conductor only shortly before the accident
happened. In getting out the car for Farnham the engine
went onto the siding from the westerly end, pulled out a
string of six cars including the Farnham car, then shunted
the Farnham car onto an adjoining track, placed two of the
other cars they had hauled out onto a third track, and then
kicked the other three cars back onto the track where the
crippled car stood. Plaintiff's intestate was on one of these
three cars for the purpose of setting the brakes and of
so placing them on this siding as not to come into contact
with the crippled car. He evidently was at the brake on
the easterly end of the easterly one of the three cars mov-
ing toward the crippled car. His foot was resting on the
small platform at the end of the car just below the brake
wheel. For some reason he did not stop the three cars
moving on this track before the cars came into contact
with the crippled car. The cars collided, and owing to the
absence of the coupler attachment and bumpers on the
crippled car intestate's leg was caught between the ends of
the two cars and he was so injured that he died from the
injuries so received. It evidently was not the intention
of any of the crew to disturb, couple onto, or move the
crippled car."

The statement that "owing to the absence of the coup-
ler attachment and bumpers on the crippled car intestate's

leg was caught between the ends of the two cars" is
disputed as a consequence or an element of decision in-
dependently of what Lang was to do and did—indeed it
is the dispute in the case. Based on it, however, and the
facts recited, the contention of petitioner is that they
demonstrate a violation of the Safety Appliance Act and
justify the judgment of the trial court and its affirmance
by the Appellate Division. For this *Louisville & Nashville
R. R. Co.* v. *Layton,* 243 U. S. 617, is cited.

The opposing contention of respondent is that "The
proximate cause of the accident was the failure of the
deceased to stop the cars before they came into collision
with the defective car. The absence of the coupler and
draw bar was not the proximate cause of the injury, nor
was it a concurring cause." To support the contention
*St. Louis & San Francisco R. R. Co.* v. *Conarty,* 238 U. S.
243, is adduced.

The Court of Appeals considered the *Conarty Case* con-
trolling. This petitioner contests, and opposes to it the
*Layton Case, supra,* and contends that the court failed to
give significance and effect to the fact that the car in the
*Conarty Case* was out of use and that while out of use the
car upon which Conarty was riding collided with it;
whereas in the case at bar, it is insisted that the defective
car was in use by defendant and was required to be used
by the intestate. The trial court made this distinction
and expressed the view that the defective car in the case at
bar "must be deemed to have been in use within the
meaning of the statute." The distinction as we shall
presently see is not justified. It is insisted upon, however,
and to what is considered its determination is added a
citation from the *Layton Case* declaring that the Safety
Appliance Act makes "it unlawful for any carrier engaged
in interstate commerce to use on its railroad any car not"
equipped as there provided. And further, "By this legis-
lation the qualified duty of the common law is expanded

into an absolute duty with respect to car couplers" and by an omission of the duty the carrier incurs "a liability to make compensation to any employee who" is "injured because of it." But necessarily there must be a causal relation between the fact of delinquency and the fact of injury and so the case declares. Its concluding words are, expressing the condition of liability, "that carriers are liable to employees in damages whenever the failure to obey these safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty." The plaintiff recovered because the case came, it was said, within that interpretation of the statute.

We need not comment further upon the case nor consider the cases which it cites. There is no doubt of the duty of a carrier under the statute and its imperative requirement or of the consequences of its omission. But the inquiry necessarily occurs, to what situation and when, and to what employees, do they apply?

The Court of Appeals was of the view that it was the declaration of the *Conarty Case* that § 2[1] of the Safety Appliance Act "was intended to provide against the risk of coupling and uncoupling and to obviate the necessity of men going between the ends of the cars. It was not intended to provide a place of safety between colliding cars," and that "the absence of a coupler and drawbar was not a breach of duty toward a servant in that situation." It further decided that Lang was in "that situation" and he "was not one of the persons for whose benefit the Safety Appliance Act was passed."

---

[1] § 2 of the Safety Appliance Act is as follows: "On and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier [one engaged in interstate commerce] to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." 27 Stat. 531.

Two questions are hence presented for solution. (1) Was the Court of Appeals' estimate of the *Conarty Case* correct? (2) Was it properly applied to Lang's situation?

(1) The court's conclusion that the requirement of the Safety Appliance Act "was intended to provide against the risk of coupling" cars, is the explicit declaration of the *Conarty Case.* There, after considering the act and the cases in exposition of it, we said, nothing in its provisions "gives any warrant for saying that they are intended to provide a place of safety between colliding cars. On the contrary, they affirmatively show that a principal purpose in their enactment was to obviate 'the necessity for men going between the ends of the cars. 27 Stat. 531.'"

The case was concerned with a collision between a switch engine and a defective freight car resulting in injuries from which death ensued. The freight car was about to be placed on (we quote from the opinion) "an isolated track for repair and was left near the switch leading to that track while other cars were being moved out of the way—a task taking about five minutes. At that time a switch engine with which the deceased was working came along the track on which the car was standing and the collision ensued." The deceased was on the switch engine and was on his way "to do some switching at a point some distance beyond the car" and was "not intending and did not attempt, to couple it to the engine or to handle it in any way. Its movement was in the hands of others."

(2) That case, therefore, declares the same principle of decision as the Court of Appeals declared in this, and, while there is some difference in the facts, the difference does not exclude the principle. In neither case was the movement of the colliding car directed to a movement of the defective car. In that case the movement of the colliding car was at night, and it may be inferred that there was no knowledge of the situation of the defective car. In

this case the movement of the colliding car was in the day time and the situation of the defective car was not only known and visible, but its defect was known by Lang. He, therefore, knew that his attention and efforts were to be directed to prevent contact with it. He had no other concern with it than to avoid it. "It evidently was not," the trial court said, "the intention of any of the crew [of the colliding car] to disturb, couple onto, or move the crippled car." It was the duty of the crew, we repeat, and immediately the duty of Lang, to stop the colliding car and to set the brakes upon it "so as not to come into contact with the crippled car," to quote again from the trial court. That duty he failed to perform, and, if it may be said that, notwithstanding, he would not have been injured if the car collided with had been equipped with draw bar and coupler, we answer, as the Court of Appeals answered, still "the collision was not the proximate result of" the defect. Or, in other words, and as expressed in effect in the *Conarty Case*, that the collision under the evidence cannot be attributed to a violation of the provisions of the law "but only that had they been complied with it [the collision] would not have resulted in the injury to the deceased."

*Judgment affirmed.*

MR. JUSTICE CLARKE, with whom concurred MR. JUSTICE DAY, dissenting.

Because I think that the court's decision of this case will result in seriously confusing the law applicable to the Safety Appliance Acts of Congress, I shall state, as briefly as I may, my reasons for dissenting from it.

When Lang, a brakeman in the employ of the New York Central Railroad Company, received his fatal injuries the Safety Appliance Acts of Congress declared it to be "unlawful" for an interstate carrier by rail to "use on its line" any car not equipped with automatic couplers, and also

provided that any employee injured by any car not so equipped should not be held to have assumed the risk of injury thereby occasioned by continuing to work after the unlawful use of such a car had been brought to his knowledge (27 Stat. 531, §§ 2 and 8; 32 Stat. 943, § 1).

At that time also the Federal Employers' Liability Act provided that in any action brought under the act no employee should be held to have been guilty of contributory negligence or to have assumed the risks of his employment in any case where the violation by the carrier of any statute enacted for the safety of its employees contributed to the injury or death of such employee. (35 Stat. 65, §§ 3 and 4.)

It is obvious that these statutes take out of this case all question as to assumption of risk by, and contributory negligence of, the deceased brakeman.

Since the decision in *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Taylor*, 210 U. S. 281, 295, this court has consistently held that in enacting the Safety Appliance Acts: "*The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just.* If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it."

*Chicago, Burlington & Quincy Ry. Co.* v. *United States*, 220 U. S. 559. Here the court declares that the Safety Appliance Act imposes "An absolute duty on the carrier and the penalty cannot be escaped by exercise of reasonable care."

*Texas & Pacific Ry. Co.* v. *Rigsby*, 241 U. S. 33. Here the court said: "Disregard of the Safety Appliance Act is a wrongful act; and, where it results in damage to one of the class for whose especial benefit it was enacted, the right to recover the damages from the party in default is implied."

*Louisville & Nashville R. R. Co.* v. *Layton,* 243 U. S. 617, 621. Here the foregoing cases are cited, and the court declares: "While it is undoubtedly true that the immediate occasion for passing the laws requiring automatic couplers was the great number of deaths and injuries caused to employees who were obliged to go between cars to couple and uncouple them, yet these laws as written are by no means confined in their terms to the protection of employees only when so engaged. The language of the acts and the authorities we have cited make it entirely clear that *the liability* in damages to employees for failure to comply with the law *springs from its being made unlawful to use cars not equipped as required,*—not from the position the employee may be in or the work which he may be doing at the moment when he is injured. *This effect can be given to the acts* and their wise and humane purpose can be accomplished *only by holding, as we do, that carriers are liable to employees in damages whenever the failure to obey these safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty.*"

*Minneapolis & St. Louis R. R. Co.* v. *Gotschall,* 244 U. S. 66. Here a brakeman, going over the tops of cars when a train was in motion, was thrown under the wheels by a sudden jerk caused by the setting of brakes when defective couplers parted, and the company was held liable "in view of the positive duty imposed by the statute  . . ·.  to furnish safe appliances for the coupling of cars."

Regarding the case at bar as ruled by the decisions we have cited, especially by *Louisville & Nashville R. R. Co.* v. *Layton, supra,* the trial court held the railroad company liable and sent the case to the jury for the assessment of damages only. The Appellate Division affirmed the judgment but the Court of Appeals reversed it solely upon the authority of *St. Louis & San Francisco R. R. Co.* v. *Conarty,* 238 U. S. 243.

It is plain that the principle of the cases quoted from is that carriers should be held liable to employees in damages whenever failure to obey the Safety Appliance Laws is the proximate cause of the injury to them when engaged in the discharge of their duty.

With these statutes and decisions in mind, we come to the consideration of the facts in this case.

Lang, a brakeman, was a member of the crew of a local freight train, running from Erie, Pennsylvania, easterly to Buffalo, New York. When the train reached Silver Creek, an intermediate station, the conductor was directed to pick up a car then on the "house track," and to take it in his train to Farnham, New York. We shall refer to this car as the "Farnham car."

For more than two weeks prior to the accident to Lang, there had been in the Silver Creek yard a box car loaded with steel, from one end of which, for three or four days before the accident certainly, (how much longer does not appear), the entire coupler and draw bar had been missing. This car had been held for unloading, which had been commenced before but was completed on the day of the accident. It had been necessary during this time to switch the car about the yard, and the crew of which Lang was a member had shifted it at least once on the day before the accident.

When the conductor went to look for the Farnham car he found it standing on the "house track" with five other cars to the west of it and four cars to the east of it, the car next it on the east being the defective car, with the draw head missing from its west end (the end next the Farnham car). Thus this "house track," with capacity for twelve cars, had ten standing upon it, of which the defective car was one—necessarily they must have been very close together.

The conductor saw that it was impossible to switch out the Farnham car from the east end of the "house track"

without moving the defective car, and thereupon he ordered his engine to go through the switch at the west end of the "house track," to couple to the six cars standing to the west of the defective car, and then to back out an switch the Farnham car (which would be the most easterly one of the string) onto another track where it could be picked up later. This being done, the two cars farthest from the engine were shunted onto a third track, thus leaving but three cars attached to the engine. The plan then was to "kick" these three cars back onto the "house track" and to stop them when near to the defective car but before they came in contact with it. It was while attempting to accomplish this purpose that the accident occurred.

The movement which resulted in the accident is described by the conductor, who was standing at the switch at the west end of the "house track," as follows:

The engine kicked the three remaining cars onto the "house track" and after they were started Lang, who was standing near the conductor, got on the head car, "the one nearest to the cripple," for the purpose of stopping them. When he got upon this box car, it was about four car lengths from the defective end of the defective car, and the track was slightly down grade toward it. His purpose was to get to the brake at the head end of the head car so as to stop the three before they touched the defective car, but, either because the cars had been started too rapidly by the engine, or because the brake did not work well, or because the track was down grade, or because the time or distance was too short, he did not get the cars stopped in time to prevent them from colliding with the defective car. At the moment of the impact, Lang, who was in the act of setting the brakes, had one foot on the brake step attached to the end of the head car, and, because the draw head was missing from the defective car, the ends of the two cars came together, so crushing his leg between them that he died

within a few days thereafter. Thus did Lang, who was as much without fault in fact as the statutes cited rendered him without fault in law, come to his death.

It is the uncontradicted evidence that if the bad order car had been equipped with such a coupler as the law required the ends of the two cars could not have come nearer together than thirty inches and the accident, of course, could not have occurred.

It seems to be the theory of the opinion of the court that, because the conductor realized the danger there was in the defective car and aimed to avoid moving it, therefore it was not "in use" by the company within the meaning of the Safety Appliance Acts.

But a car in such dangerously defective condition as this one was, which for convenience in unloading was kept for days, perhaps for weeks, in a yard so crowded that it was necessary to move it from time to time in the ordinary yard switching, cannot reasonably be said to have been "out of use" during that time. To allow such a car to be placed upon an unloading track, so short and crowded that a slight excess of speed in moving other cars, or a slight defect in the brakes or a moment of delay in applying them, might result, as it did in this case, in the injury or death of employees, cannot reasonably be said to be keeping such a car "out of use." As a matter of fact, the defective car was actually in use in a most real and familiar way on the very day of the accident, for, on that day, the unloading of it, which had been commenced before, was completed while it was on the "house track" on which the accident occurred.

The *Layton Case, supra,* coming after the *Conarty Case,* decided (all the members of this court as now constituted concurring) that: "Carriers are liable to employees in damages whenever the failure to obey these safety appliance laws is the proximate cause of injury to them when engaged in the discharge of duty;" and the *Gotschall Case,* 244 U. S. 66,

clearly proceeded upon the same principle. Neither of the men injured in the *Layton* or *Gotschall Cases* was engaged in coupling or uncoupling cars when the accident occurred, but each was injured because of defective coupling appliances when he was going over the cars of his train in the discharge of his duty. Here Lang was injured, when in the discharge of his duty, because a defective car had been placed upon a much used track in a busy yard in such a position that it was impossible for him, in the exercise of due care, to prevent the cars he was seeking to control from coming in contact with it.

It would be difficult to conceive of a case in which the negligence of the master could be a more immediate and proximate cause of injury to a servant than it was in this case.

Having regard to the extent to which this case must be accepted by other courts as a rule of decision, it would seem that the orderly and intelligible administration of justice required that the principle of the *Layton* and *Gotschall Cases* should be disavowed or overruled, for that principle is so plainly in conflict with the opinion in this case that courts and advising counsel will otherwise be left without any rule to guide them in the disposition of the many similar cases constantly pressing for disposition.

For the reasons thus stated I think the judgment of the Court of Appeals entered by the Supreme Court of New York should be reversed and the original judgment of the Supreme Court affirmed.