### Callihan's Administrator v. Chesapeake & Ohio Railway Company.

(Decided June 17, 1924.)

### Appeal from Boyd Circuit Court.

Master and Servant—Absence of Headlight on Engine Held Cause of Brakeman's Injury.—Movement of engine without headlight on improper track was violation of Boiler Inspector Act Feb. 17, 1911, section 2, as amended by Act March 4, 1915, section 1 (U. S. Comp. Stats., sections 8631, 8639d), as against contention that unintended and unnecessary movement of car, and not defective appliance, was proximate cause of death of brakeman.

JOHN W. WOODS and JOHN T. DIEDERICH for appellant.

PRICHARD & MALIN and WORTHINGTON, BROWNING & REED for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Leonard Callihan, a brakeman in the employ of the Chesapeake & Ohio Railway Company, was thrown from a cut of cars and killed. His administrator brought this suit to recover damages for his death. At the conclusion of the evidence the trial court directed a verdict in favor of the railroad company, and the correctness of that ruling is the only question presented by the appeal.

It is conceded that, at the time of the accident the railroad company was engaged, and Callihan was employed, in interstate commerce. Suit was brought under the Federal Employers' Liability Act for an alleged violation of the Boiler Inspection Act of February 17, 1911, as amended by the act of March 4, 1915, Comp. St., sections 8630-8639d. The particular negligence relied on was the use and operation of the engine without a headlight, which, it likewise is conceded, is prohibited by the amendment which declares that the original act "shall apply to and include the entire locomotive and tender, and all parts and appurtenances thereof." Comp. St., section 8639a. The trial court was of the opinion that the absence of the headlight was not the proximate cause of the accident. The decision of this question will require a brief statement of the facts.

In the railroad yards at Ashland are located a roundhouse and shops and several tracks. The yard tracks connect with the "lead" track, which in turn connects with two main line tracks. Of the switch tracks, No. 1 is only a continuation of the "lead" track, while track No. 2 is the next switch track leading off the "lead" track. These switch tracks are controlled by the same switch. When the target is clear, the switch is set for track No. 1. When the target is green, the switch is set for track No. 2. The yard crew consisted of the conductor, or foreman, the engineer, fireman and two brakeman, and Callihan was the head brakeman. In the switching operations, it was his duty to see that the switches were properly lined up, to give the engineer the necessary signals and instructions as to the particular movement to be made, and to ride on the head end of the train. On the day of the accident the crew went on duty at two o'clock in the afternoon. About seven o'clock that evening the entire crew returned to the roundhouse for the purpose of eating lunch and getting water for the yard engine which

was used in the switching operations. The last work done by the crew before returning to the roundhouse was to place a cut of cars on track No. 1. While at the round-house, the foreman was instructed by the assistant yard master to take the engine to the west end of Ashland, pick up a cut of cars standing on the eastbound main line, take the cars up to the yards, and place them on track No. 2, and if that track would not hold all the cars to place the remainder on track No. 1. The reason for the order was that track No. 2 was empty, while there were already some cars on track No. 1. Following the directions of the assistant yard master, the foreman told Callihan that the cars were to be placed on track No. 2. Though the engine had no headlight, it was taken out of the roundhouse, and attached to the cut of cars, fifty-seven in number, and proceeded east through the yards. While *en route,* Callihan told the engineer that the cars were to be switched into track No. 1, and the switch was set for that track. Receiving a signal to go ahead, the engineer ran the train into track No. 1 for a distance of about 150 feet, and collided with the cut of cars standing on that track. Callihan was thrown from the top of the car next to the tender and instantly killed. The night was very dark, and there being no headlight on the engine, the engineer and fireman were unable to see the cut of cars until too near to prevent a collision. There was further evidence that a good headlight on the engine would have enabled the engineer and fireman to see for a distance of more than 300 feet, and that the speed of the train was such that it could have been stopped within 35 or 40 feet.

Counsel for appellee insist that St. Louis, etc., R. Co. v. Conarty, 238 U. S. 243, 59 L. Ed. 1290; Lang v. New York Central R. Co., 255 U. S. 455, 65 L. Ed. 729, and McCalmont v. Pennsylvania R. Co., 283 Fed. 736, are conclusive of the case at bar, and place great stress on the following language of Judge Denison in the McCalmont case:

> "It is quite apparent that the defective coupling was not the direct cause of McCalmont's injury in the same way and to the same degree as in cases where a brakeman is actually trying to make a coupling with a car which is at the moment coming on for that purpose; yet there was a seeming cause and effect relationship from the fact that, except for the defective coupling, McClamont would have had no occasion to go between the cars at this point and

would not have been hurt. We think the properly logical view of such situation, and the authoritative precedents to be discussed, fairly indicate that such accidents fall into two classes—the one where the impact of the two cars which injures the workman is a part of the movement in which he is purposely participating; the other where this impact is rather a collision which is no part of the plan. In the former class nothing happens which was unintended or which should have been avoided. The presence of the insured person between the cars is the immediate cause of the injury; and that presence was induced by the defective coupling, which is therefore, in law, the proximate cause. In the other class of cases the unintended and unnecessary collision is the immediate cause of the injury, the presence of the injured person at the danger point is an incident or a condition, and we must therefore look to see whether the defective coupler is the cause of the collision. If so, then it is the proximate cause of the injury; otherwise it is a remote cause.

"The decisions of the Supreme Court may well be compared, and are fully reconcilable, from this viewpoint. In the Conarty case, 238 U. S. 243, 35 Sup. Ct. 785, 59 L. Ed. 1290, the defective coupler was the immediate thing which permitted the two colliding cars to come so close together that Conarty was caught between. If the coupler had been in good order, Conarty would not have been hurt. The collision between the defective car and the engine was no part of an intended coupling movement, but was entirely distinct and quite unnecessary. The reasoning of the court is that the injury was caused by the collision, that the collision was not caused by the defective coupling, and hence that the Safety Appliance Act did not create a liability. In the Layton case, 243 U. S. 617, 37 Sup. Ct. 456, 61 L. Ed. 931, there was a deliberate attempt to make a coupling by impact with a string of five cars standing on the track. Plaintiff was on one of these five cars for the purpose of cooperating in the coupling operation. Owing to the presence of a defective coupler, the attempt to make this coupling failed, and, as the necessary alternative of the failure, the five cars were pushed along the track into collision with others standing there, and this collision was the immediate

cause of plaintiff's injury. Therefore in this case, there is a direct chain of cause and effect—the intended coupling, the defective drawbar, the resulting unintended collision, and the finally resulting injury. In the Gottschal case, 244 U. S. 66, 37 Sup. Ct. 598, 61 L. Ed. 995, the train broke in two and the imperfect coupler caused the parting which set the brakes, which caused the unintended stop and shock, which injured plaintiff. In the Lang case, 255 U. S. 455, 41 Sup. Ct. 381, 65 L. Ed. 729, we have again the case of an unintended collision not caused by a defective coupler. The collision would have occurred just the same if there had been no defective coupler; and thus the case is classified with the Conarty case. Also, just as in the Conarty case, the plaintiff would not have been hurt or might not have been hurt, except for the defective coupler, but in the Lang case also the defect was considered a condition, and not a cause of the injury."

It is argued that the rule deduced by Judge Denison from the foregoing decisions of the United States Supreme Court is that if the movement which resulted in the injury was intended, then the defective appliance was the proximate cause of the accident, since there was no intervening act or happening which was unintended, or which should have been avoided; but that if the movement which resulted in the injury was unintended and unnecessary and was no part of the master's plan, then this unintended and unnecessary movement is the proximate cause of the injury, and the defective appliance is a mere incident or condition, i. e., a remote cause. Applying this rule to the case in hand, it is contended that the movement of the cars into track No. 1 was not in accord with the intended plan of operation, but on the contrary, was in violation of the master's instructions, and was therefore an unintended, unnecessary and improper movement, from which it follows that the unnecessary and unintended movement, and not the absence of the headlight, was the proximate cause of the accident. When Judge Denison's able opinion is examined in the light of the particular facts of each case under discussion, it is apparent, we think, that it falls short of sustaining the broad rule stated by counsel.

In the Conarty case the drawbar on a loaded freight car had been pulled out while the car was in transit: The

car was about to be placed on an isolated track for repair, and was left near the switch leading to that track, while other cars were being moved out of the way. While standing there, a switch engine came along and collided with it. Conarty was riding on the front of the engine and was caught between the engine and the car. If the coupler had been in good condition, it would have kept the engine and the car far enough apart to have prevented the injury. At the time of the accident Conarty and his companions with the switch engine were on the way to do some switching at a point some distance beyond the car, and did not attempt to couple the engine or to handle it in any way. The movement of the car was in the hands of others. In denying a recovery, Mr. Justice Van Devanter, who delivered the opinion, after adverting to the fact that the principal purpose in the enactment of the automatic coupler provisions of the Safety Appliance Act was to obviate the necessity for men going between the ends of the cars, stated the conclusion of the court in the following language:

> "We are of opinion that the deceased, who was not endeavoring to couple or uncouple the car or to handle it in any way, but was riding on the colliding engine, was not in a situation where the absence of the prescribed coupler and drawbar operated as a breach of a duty imposed for his benefit, and that the supreme court of the state erred in concluding that the safety appliance acts required it to hold otherwise."

In the Lang case a loaded car with no coupling apparatus on the west end had been placed on a siding at Silver Creek. On the same track was also another car destined for Farnham, the next station east. The train crew, of which Lang was a member, had orders to pick up the Farnham car, and the condition of the defective car was known to them. The Farnham car was practically in the middle of a string of eleven cars, and next to the defective car. In order to get out the Farnham car, it was necessary to pull out the first six cars, which left the defective car on the front end of the remaining cars which were on the side track. After the Farnham car had been placed where it might be picked up later, the switch engine switched two of the remaining cars on to another side track, and then kicked the three remaining cars back on the original track on which the defective

car was standing. Lang, the foreman, was on the rear end of the three cars. It was not intended that the cars on which Lang was riding should collide or come in contact with the defective car. For some reason Lang's car was not stopped as intended, but ran into the defective car. Owing to the absence of the drawbar on the defective car, the two cars came so close together that Lang was crushed between them and killed. Proceeding on the theory that it was not the intention of any of the crew of the colliding car to disturb, couple on to, or move the crippled car, the court followed the Conarty case and held that the collision was not the proximate result of the injury.

In the McCalmont case a car with a defective coupler was on a dead track awaiting transfer to the shops for repair. It was attached to the next car by a chain. Plaintiff's intestate, a foreman of car inspectors, passing with a helper, went between the cars to shorten the chain when a collision was caused by the shunting of another car on to the dead track, the decedent being killed as the result of the collision. The rules required all employees, when working about standing cars, to set out a signal flag, which decedent failed to do. It was held that the proximate cause of the collision and the injury was the failure to set out the flag, and that the defective coupler was not a cause, but only a condition of the injury.

It will be observed that the foregoing were all cases of defective couplers, and in each instance a recovery was denied on the ground that the main object in the enactment of the Safety Appliance Act with respect to couplers was to obviate the necessity for men going between the ends of the cars for the purpose of coupling or uncoupling, and that where an employee, not engaged in the performance of this service, is injured by a collision between a defective car and another car or engine, when there was no intention or attempt to couple the other car or engine to the defective car, or to handle the defective car in any way, the defect is not the proximate cause of the injury. In the case at bar, however, a different situation is presented. The Boiler Inspection Act as amended makes it unlawful to use an engine in moving interstate or foreign traffic unless the engine and its appurtenances are in proper condition and safe to operate in the service to which the same is put. U. S. Comp. Stat., sections 8631, 8639a. When it is dark, no appurtenance is more necessary than a headlight. Its use is

not restricted as in the case of couplers. Its purpose is to throw light in order that employees may see not merely at some particular time, but at all times when it is dark. It is designed not only to prevent unnecessary violence from intended collisions, but to protect employees against injury from all collisions whether intended or not. The case is not one where the engine was at rest, and no movement whatever was intended. On the contrary, the engine had been taken from the roundhouse. It was the motive power. It was out on the tracks for the purpose of moving interstate traffic and was so engaged at the time of the accident. Owing to Callihan's mistake in transmitting the order, the train was run into track No. 1. Though the particular movement was not intended by the foreman, it was intended by the engineer who was operating the engine. In the circumstances every movement of the engine without a headlight, whether before or after the giving of the incorrect order, was a clear violation of the statute, and the violation continued up to the time of the injury. By no refinement of reasoning can it be said that Callihan, who was on the car next to the engine, was not in a position where the absence of a proper headlight operated as a breach of duty imposed for his benefit. On the contrary, it was precisely the situation thus presented that the headlight requirement was enacted to meet. It is true that the collision was attributable to a violation of the headlight provision only in the sense that if the provision had been complied with, no collision would have occurred and no injury have resulted, but as the main office of a headlight is to avoid unexpected collisions, that is the only sense in which a violation of the provision may be the proximate cause of an injury. If, in such circumstances, the company may escape liability on the ground that the particular movement resulting in the collision was in violation of the orders of some employee superior in authority to the engineer, and was therefore unintended and unnecessary, the purpose of the statute will be defeated. After all is said, the case is one where there was substantial evidence to the effect that, notwithstanding Callihan's negligence in transmitting the order, no injury would have resulted if, at the time of the accident, the engine had not been moving without a headlight, and it would be going far afield to say as a matter of law that the violation of the statute was the occasion and not the immediate cause of

the accident. From this view of the case, it necessarily follows that the trial court erred in sustaining appellee's motion for a directed verdict.

Judgment reversed and cause remanded for a new trial consistent with this opinion.