## CORAY v. SOUTHERN PAC. CO.

No. 6967. Decided October 31, 1947. (185 P. 2d 963.)

Reversed by U. S. Supreme Court March 1, 1949.

*Rawlings, Wallace & Black* and *Clyde & Coray*, all of Salt Lake City, for appellant.

*Ray, Quinney & Nebeker*, of Salt Lake City, for respondent.

McDONOUGH, Chief Justice.

The trial court directed a verdict against the plaintiff administrator in an action against the railroad for alleged wrongful death, and plaintiff appeals. There is no serious dispute as to the facts. Plaintiff contends that the death resulted from negligence in alleged violation of the Safety Appliance Act, 45 U. S. C. A. § 1 et seq., while respondent contends that the decedent was furnished with a safe appliance and mechanism, and that the death of decedent was proximately caused solely by his own heedless conduct in running into the caboose of a freight train which had come to an emergency stop.

On May 24, 1944, decedent and one Lynch waited for eastbound freight-train No. 1/582 to pass, which was required to take the next siding east of Newfoundland to permit west bound passenger train 587 to go through on the main line. Lucas was in charge of a track car and he had some pay checks to take to the men at the next station. Lucas and Lynch pushed the motor track car onto the track behind the freight train and proceeded to follow the train which was scheduled to go onto the next siding. There was a company rule in effect which required operators of track cars to keep such cars at least 400 feet from the rear of the train. Such track car could be operated at a speed of not to exceed 35 miles per hour and at such speed could be stopped within a distance of 100 feet. When the track car was started, it was about 900 to 1200 feet behind the freight train. Both the freight train and the track car were traveling toward the approaching passenger train. Decedent operated the track car, and both he and Lynch faced the west instead of the direction toward which they were moving. With their backs toward the east they in effect were traveling backwards.

When the freight train was about ¾ of a mile east of Lemay, Utah, it came to an emergency stop before it reached the siding. The train being equipped with airbrakes, came to a sudden but easy stop by reason of the fact that the triple union nut became disconnected from the triple-valve on the 60th car from the engine, which disconnection was due to the threads on the triple-valve being worn. As a result of the triple union nut becoming disconnected from the triple-valve, it permitted the air to escape from the airline and to set the brakes in emergency.

There was no jerking, and it required about 1350 to 1800 feet distance to complete the stop. The braking system is so designed that such event will occur when the air is released, air-pressure being essential to release the brakes and to keep them released. The conductor noticed that there was an emergency stop, and one witness stated that it appeared that the engineer had decided that he could not make it to the siding. When attention was called to the air-gauge, it was noted that it registered zero, which meant that the air had been released. Just at that moment, one of the men in the caboose observed decedent and Lynch on the track car with their backs to the train which they were approaching, about three car lengths or about 150 feet to the rear. Some attempts were made to signal to these men on the track car, but such efforts were in vain in consequence of the failure of the men on the track car to face the direction in which they were moving and also by reason of the noise of the motor. The track car crashed into the rear of the caboose, throwing off both men and in consequence of such collision decedent was killed. Lynch received injuries, but they were not fatal.

At the outset, we are confronted with a motion on behalf of respondent to strike the bill of exceptions on the ground that it was not settled in time, and also, a motion to dismiss the appeal, inasmuch as it was filed more than 90 days after entry of judgment.

The judgment on the verdict was entered April 6, 1946. Notice of appeal was served on July 3, 1946, but it was not

filed with the clerk until July 6th, which was 91 days after entry of judgment. However, there appears in the record an order dated July 1, 1946, denying a motion for new trial. That a motion for a new trial, seasonably made, suspends the finality of a judgment until the court's ruling thereon (*Fuller* v. *Ferrin et al.*, 51 Utah 105, 168 P. 1179, and cases there cited), is conceded by respondent. Likewise, the statutory time allowed for settlement of a bill of exceptions, in cases in which a motion for a new trial is interposed, runs from notice of the ruling on such motion. Sec. 104-39-4, U. C. A. 1943.

But respondent apparently takes the position that the record on appeal must affirmatively show that the motion for a new trial was made within the time allowed by statute or such extensions thereof as may have been granted by the trial court. The papers filed in this court contained a motion by appellant to be relieved of his default in failing to timely serve notice of motion for a new trial, together with supporting affidavits and an order of the trial court granting the relief prayed. These were not incorporated in the bill of exceptions and respondent contends that they are not included in the judgment roll. Appellant argues that they are. Without discussing the cases cited by respondent in support of its contention, we shall assume that they are not and are hence not before us on appeal.

We have, therefore, a record which discloses the date, indicated hereinabove, upon which the motion for a new trial was overruled, the order overruling such motion being a part of the judgment roll, and which reveals that the appeal was taken and the bill of exceptions served within the time allowed by statute. Was it incumbent upon appellant to show by the record that the motion so overruled was timely made? We think not. If the contrary be held, then in the case of every appeal which an appellant desires to predicate on the judgment roll without an extended bill of exceptions, it would be necessary to settle a bill containing merely the date upon which the motion for a new trial was

made. The statutes do not so provide, nor do principles of appellate procedure so dictate. True, this court will sua sponte take cognizance of its lack of jurisdiction. Furthermore, the record before us must show jurisdiction. The record does so show when it reveals that notice of appeal was served and filed within 90 days after the date of an order overruling a motion for a new trial. This prima facie showing of jurisdiction may, of course, be negatived by other parts of the record. Thus, if the bill of exceptions contains the motion for a new trial exhibiting that it was not timely filed, lack of jurisdiction is shown, unless there is also evidenced by such record a timely extension of time for filing the motion or an order relieving appellant of his default in failing to move in time.

The cases cited by respondent are not to the contrary. In *Progress Spinning & Knitting Co.* v. *Dixie Fire Ins. Co.*, 43 Utah 303, 134 P. 1166, the record affirmatively showed that the notice of intention to move for a new trial was given twenty days after judgment and there was no claim that appellant had been relieved from his default in failing to file the same in time. Under those circumstances we held that we could not assume that appellant had been relieved from his default in the absence of a showing that the motion for a new trial was not in fact overruled because it was not filed in time. To the same effect is *Felt* v. *Cook*, 31 Utah 299, 87 P. 1092. In those cases the record disclosed the time when notice of intention to move for new trial was served. In *Warnock Ins. Agency* v. *Peterson Inv. Co.*, 35 Utah 542, 101 P. 699, the notice of appeal was served more than six months after judgment (the time then allowed for taking an appeal being six months). There, as here, the notice of intention to move for new trial, motion for new trial and order overruling the same were attached to the judgment roll, but not made a part of the bill of exceptions. At that time the statute did not make the order overruling the motion for new trial a part of the judgment roll. We held that the record respecting the motion for new trial was not a part of the judgment roll, and therefore not before

us on appeal. Hence, we could not consider the same and the appeal was dismissed.

Respondent points out that appellant concedes in his brief that the notice of motion for a new trial was not served and filed within five days after entry of judgment. However, this concession is made as a preface to his argument that the motion to be relieved of default and ■ the order made pursuant thereto are properly before us in the judgment roll. The mere exhibition of these documents would reveal that the notice of motion for a new trial was not filed within five days after entry of judgment, but if they may not be considered for the purpose of showing the order relieving of default, because not properly a part of the record, neither may they be regarded to show the default itself. The concession in the argument made in effect in connection with the proffer of the documents in question should be disregarded as well as the documents themselves. The motion to dismiss the appeal and the motion to strike the bill of exceptions are denied.

We are next met by the contention of respondent, to the effect that since no exception was expressly taken to the order directing the verdict for defendant, the alleged error of the trial court in directing the verdict ■ cannot be reviewed by this court, citing *Stewart* v. *Oregon Short Line R. Co.*, 39 Utah 375, 117 P. 465. In that case plaintiff sought to recover damages for personal injuries and the court directed a verdict in favor of the defendant. No exception was expressly taken to the ruling, but appellant contended that under the statute then in effect pertaining to exceptions, such a ruling was deemed excepted to by statute. This court construed sec. 3283, C. L. 1907, which was subsequent amendments is now sec. 104-39-2, U. C. A. 1943. Such section, with the amendments made since 1907 italicized, reads as follows:

"The verdict of the jury, the final decision in an action or proceding, an interlocutory order or decision finally determining the rights of the parties, or some of them, an order or decision from which an appeal may be taken, an order sustaining or overruling a demurrer,

allowing or refusing to allow an amendment to a pleading, striking out a pleading or a portion thereof, or refusing a continuance, *an order granting or denying a motion for nonsuit,* an order made upon ex parte application, an order or decision made in the absence of a party, *and all rulings on objections to, or motions to strike out, evidence,* are deemed excepted to."

In the Stewart case this court held that inasmuch as the statute as it then existed was identical with sec. 647 of the California Code of Civil Procedure, and the Supreme Court of that state had held that a motion for nonsuit will not be reviewed where no exception was taken to the ruling, a motion for a directed verdict should be considered in the same category although the effect of granting such motion is to terminate the action. This court followed the rule that an order granting nonsuit will not be reviewed unless an exception is taken, until the statute was amended to specify that an order granting or denying a motion for nonsuit is deemed excepted to. *Moapa Garden Co.* v. *San Pedro, L. A. & S. L. R. Co.,* 45 Utah 141, 143 P. 218, and *Badertscher* v. *Independent Ice Co.,* 55 Utah 100, 184 P. 181.

In *Frank* v. *Myers,* 60 P. 2d 144, 145 (hearing denied by Supreme Court), 16 Cal. App. 2d 16, in overruling the contention of respondent that an order of the trial court directing a verdict is not reviewable absent an express exception thereto, the appellate court construed such order as an instruction to which, under the California code, an exception is deemed taken. A further reason for the ruling of the appellate court is thus expressed:

"Moreover, the record discloses that the instruction to the jury to direct a verdict for defendant was given 'over the objections' of plaintiff. Section 648 of the Code of Civil Procedure provides that 'no particular form of exception is required,' and section 646 of the Code of Civil Procedure provides that 'an exception is an objection upon a matter of law to a decision made, either before or after judgment'."

While it is true in a sense that the motion for a directed verdict is in the nature of a request for instruction, and

that in some instances there is a request for a directed verdict included in proposed instructions, the charge to the jury generally is designed to guide the jury in its deliberations. When the court directs a verdict, it takes the case away from the jury so that the court makes the decision instead of the jury. The jury thereby is shorn of its function as trier of the facts.

We believe that the decision in *Stewart* v. *Oregon Short Line R. Co.,* supra, examined in the light of the practical operation of court procedure, is illogical. The holding in that case seems to have failed to take into consideration the language of the statute which grants an automatical exception to

"the final decision in an action or proceedings; an interlocutory order or decision finally determining the rights of the parties, or some of them." [39 Utah 375, 117 P. 466.]

An order directing a verdict leaves nothing to the discretion of the jury and finally disposes of the case, except for the formal entry of judgment on the verdict, as conceded in the Stewart case. It would be difficult to conceive of a situation in which an order is made which finally determines the rights of the parties if an order directing a verdict does not do so. If the court directs a verdict when the case should be presented to the jury, the jurors are deprived of serving as triers of the fact.

Since we are dealing with a procedural rule rather than one of substantive law, we are less reluctant to overrule *Stewart* v. *Oregon Short Line R. Co.,* supra, and to hold that the statute gives an automatic exception to an order or ruling of the court directing a verdict, since the order or ruling constitutes a "decision finally determining the rights of the parties."

In addition to what has been said, there is another reason why a party should not be required to take an express exception to a directed verdict. The purpose of an exception is to furnish a basis for review, and also to first give the trial court opportunity to correct error. When

a directed verdict is ordered, it is almost always, as the record discloses it was in this case, after argument, when opportunity has been given to determine the matter with deliberation. The party against whom the verdict is directed has voiced his objection to the order requested.

As triers of the facts, jurors have the right to resolve conflicts in evidence, and to draw reasonable inferences from the facts so found. Jurors sitting as triers of the fact are not empowered to decide legal questions, nor draw any conclusions of law therefrom except as guided by the instructions of the court. If there is no dispute as to the facts, there is no occasion to instruct the jury, for the jurors have no conflict in evidence to determine, and no ultimate facts to find. The only function which would be left to the jury, if the facts were undisputed, and if the facts spelled out liability on the part of the defendant, would be a determination of the amount of the damages within the limits permitted by the facts.

Proceeding to the merits, the uncontroverted evidence set out hereinabove, shows a violation of the Safety Appliance Act by defendant. A violation of such act imposes liability upon a carrier for any injury to an employee caused "in whole or in part" by such violation. 45 U. S. C. A. § 51. *Chicago, B. & Q. Ry. Co.* v. *United States,* 220 U. S. 559, 31 S. Ct. 612, 55 L. Ed. 582; *St. Louis Iron Mountain & Southern Ry. Co.* v. *Taylor,* 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; and *Eker* v. *Pettibone,* 7 Cir., 110 F. 2d 451, and cases cited. We are thus confronted immediately with the ultimate question presented on the merits: Was the emergency stop caused by the disconnection of the triple-valve on the car in the manner described a "cause," in whole or in part, of the death of plaintiff's intestate?

The "cause" must, of course, be the legal cause, in order to be the basis of recovery. To show merely that the injury would not have occurred had there been no violation of the act, is not the equivalent of showing that the violation was the cause thereof.

"In order to be the legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent * * * . The negligence must also be a substantial factor as well as an actual factor in bringing about the plaintiff's harm. The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called 'philosophic sense', yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes." Restatement of the Law of Torts, Sec. 431, Comment (a).

Applying such criterion to the facts here presented, it is patent that the precise chain of events would have transpired had the train been intentionally brought to an emergency stop because of any of numerous conceivable exigencies. Indeed, had the train been slowed ■ down to a few miles per hour, the same result would, in all likelihood, have eventuated. The leak in the triple valve caused the train to stop, because as a safety device, it was designed to do just that. Hence, cases cited by appellant, such as *Spokane & I. E. R. Co.* v. *Campbell*, 241 U. S. 497, 36 S. Ct. 683, 60 L. Ed. 1125, wherein the jury concluded that the air brakes failed to so function as to stop the train, are not in point. The same may be said of *Didinger* v. *Pennsylvania R. R.*, 6 Cir., 39 F. 2d 798, and *Lehigh Valley R. R.* v. *Howell*, 2 Cir., 6 F. 2d 784.

This is not to say that a defect in the air line which causes the air to be released and the train to be brought to an emergency stop, may not be the legal cause of injuries resulting to an employee. Clearly it may. Thus, in *Minneapolis & St. Louis R. R. Co.* v. *Gotschall*, 244 U. S. 66, 37 S. Ct. 598, 61 L. Ed. 995, where a brakeman, walking along the top of a train of cars was thrown off and killed, when the train separated because of the opening of a coupler on one of the cars, resulting in an automatic setting of the emergency brakes and a sudden jerk; it could not well be

said that the failure of the coupler was not the legal cause of the brakeman's death. Likewise, in the case of *Chesapeake & Ohio Ry. Co.* v. *Smith,* 6 Cir., 42 F. 2d 111, cited by appellant. There the train came to an emergency stop of such violence that it threw the brakeman through the panel of the front door of the caboose, and tore loose the furniture and stove. In such case the immediacy of the result leaves no room for speculation as to its cause.

But here, the stopping of the train—whether because of the defect in the triple valve, or a proper application of the braking power—was but the creation of a condition upon which the negligence of plaintiffs' intestate operated. It was not the legal cause of the result. Had the train been intentionally stopped because of a defective appliance, and the same eventuality had transpired, could it be found that the railroad's violation of the Safety Appliance Act was the legal cause of the death of plaintiff's intestate? Had the engineer of the train noticed a "hot box" and had brought the train to a stop in order to have it remedied, and the track car collided with the train, the defective journal box would have been the *cause* of the stop, but that cause produced a non-negligent condition; that is, a condition or situation which of itself violated no duty owing to the men on the following track car.

Viewed from the standpoint of negligence, the railroad company was not negligent toward plaintiff's intestate in failing to comply with the Safety Appliance Act relative to the locomotive furnished to the crew of the train. Viewed from the standpoint of causation: Looking back from the harm to the actor's negligent conduct, it appears highly extraordinary that the negligent conduct should have brought about the harm. See Restatement of the Law of Torts, Negligence, Sec. 433.

These last statements suggest the contrary approaches of Judge Cardoza and Judge Andrews in *Palsgrof* v. *Long Island R. Co.,* 248 N. Y. 399, 162 N. E. 99, 59 A. L. R. 1253. Cardoza says the conduct of the defendant guards in pulling and pushing the passenger with the package, even if negli-

gent in relation to the holder of the package, was not a wrong toward the plaintiff who was hit by the falling scales. Andrews says the act of the guards was a negligent act, that where there is an unreasonable act, and some right may be affected, there is negligence whether damage does or does not result. Hence, he says, the case must be resolved on the question of proximate causation, and concludes that it cannot be said as a matter of law that the action of the guards was not the proximate cause of plaintiff's injuries.

So in the instant case the question of liability may be considered as a question of whether there was any breach of duty on the part of the railroad to plaintiff's intestate, rather than a question of proximate cause. Did the defendant by furnishing the train crew with a train on which there was a leaky air valve, violate any duty it owed to Lynch and Lucus? The answer may be sought, we think, by inquiring what is the objective of the Safety Appliance Act which requires such a train to be equipped with proper air brakes which shall be at all times kept in working order? What is the purpose of such brakes? Solely, to stop the train. The provisions of the act are for the purpose of protecting those—the crew of the train and others, whose safety would be endangered if the train could not be stopped; not of protecting other employees *because* the train was stopped by the brakes.

Indeed, the very design of the required braking device emphasized—if emphasis were needed—the safety objective of the provision relative to brakes. Were air brakes systems so designed that air pressure would be required to apply the braking mechanism, a brake in the air line might not be discovered until an attempt to stop the train were made. But designed as they are to set the air brakes when the air is released, a leak in the air line stops the train and prevents it being moved until the leak is repaired. So in some sense the required safety device worked as it was designed to work—the leak stopped the train, thereby advising the crew of the condition. True, there was a defect in the air line—such a defect as would

prevent the movement of the train. But the objective of the statute, insofar as brakes might be concerned, is not to protect employees from standing, but from moving trains.

Cases cited by appellant to the effect that the question of causation is one for the jury, where the evidence relative thereto is in conflict, or where different inferences may be drawn from established facts, are not helpful. See *Tennant* v. *Peoria & Pekin Union R. Co.*, 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 520. Here, there is no conflict in the evidence, nor, in our opinion, is there a basis for any inference upon the part of the jury that the violation of the Safety Appliance Act was a cause "in whole or in part" of the death of plaintiff's intestate.

"While the Federal Employers' Liability Act, 45 U. S. C. A. §§ 51-59, has relaxed the [common law proximate causation] rule, it has not so far done away with it as to hold an employer in damages if there is no other connection between the negligence and the injury than that if there had been no neglect, there would have been no injury, i. e., there must be more in the case than the negligence preceded the injury, and created a situation in which the accident, otherwise caused, resulted; there must be some degree of causation established before there may be a recovery." *Southern Pacific Co.* v. *Ralston*, 10 Cir., 67 F. 2d 958, 959.

And see, *Lang, Adm'x.* v. *New York Central R. Co.*, 255 U. S. 455, 41 S. Ct. 381, 65 L. Ed. 729.

From what has been said, it follows that the court below did not err in directing a verdict for defendant. The judgment is affirmed. Costs to respondent.

PRATT and WADE, JJ., concur.

WOLFE, Justice (concurring in part — dissenting in part).

I concur in the denial of the motions to dismiss the appeal and to strike the bill of exceptions. I also concur in the holding that an order directing a verdict for the defendant (I think it unnecessary to determine what would be the case where the verdict is directed for the plaintiff) is deemed excepted to. I am in general accord with the reasons given in the opinion for these conclusions.

As to the merits, I think the decision of the Supreme Court of the United States in *Pauly* v. *McCarthy*, 67 S. Ct. 962, points to a different conclusion. In the Pauly case this court concluded that *under the evidence* no jury question was presented as to whether the passing track segment of the railroad where Pauly's train pulled in to make an adjustment was a place to work. We concluded that there was no evidence that the employees were required to make inspections there or that they did so. It was concluded that for purposes of such repairs the passing track must be considered no different from any *other* part of the main track where in the event of an emergency such as a break-in-two, repairs might have to be made at the point where the break-down occurred because the passing track would be too far away that the use of a passing track where the situation was such as to permit the reaching of the same was for the purpose of permitting traffic to proceed and for better convenience of working but that if the situation permitted the use of a passing track for repair purposes of this sort rather than its real purpose of allowing trains to pass, it would be by chance that it could be so used; that logically, therefore, repairs enabled by chance to be made at the passing track must be considered like those required to be made any where along the shoulder of the road where they happened to occur, and if the passing track were itself considered a place to work the logical result would be that all of the shoulder of the railroad line would be a place to work.

We thought that to hold the entire shoulder of the railroad as a place to work regardless of any functions, frequent or otherwise, to be performed there, might require railroads to spend millions of dollars in widening the shoulders on every cut and fill so that an employee might safely drop off without first looking. For if there was a duty to build a flooring over a bridge at a passing track where an employee might by chance be required to make repairs in order to prevent an employee not exercising proper care from going down through the bridge, there would be a similar duty to widen every fill so as to prevent an employee, carelessly

alighting, from sliding down the side of a fill where the sides were steep.

While we have not had the benefit of an opinion of the United States Supreme Court as to the reasons for its decision, we may assume that it concluded from the evidence that in law the passing track was a place to work, or at least that, under the evidence, whether the passing track was a place to work was for the jury. Evidently we were in error in concluding that in law it could not be considered a place to work. However, in the second part of the majority opinion in the Pauly case it was held *that even if the passing tracks were held to be a place to work the sole legal cause of the injuries of Pauly was his negligence.* In order to reverse, the Supreme Court had to hold that such was not the case.

We may now parallel the two cases so far as profitable. Pauly was the sole cause of the initiation of his career of mishap. The train had come to a dead stop. He was not jerked off the car. He intentionally and deliberately dropped off without looking. His negligence consisted in failing to use the lantern on his arm to acquaint himself with the nature of the terrain beneath him. Nothing that the railroad did acted on him to initiate his fall or direct its course, nor to aggravate or contribute to its force or divert his course to his detriment. When he voluntarily abandoned the supporting force of the step, by dropping therefrom, gravity became the sole substantial operating force. The negligence of the railroad in the Pauly case must have been in not apprehending that an employee while engaged in the employer's business might have a lapse, and in not building a board walk or balustrade to save him from the effect of that lapse by interrupting his fall, or in not furnishing the bridge with warning lights which supposedly would have prevented the lapse. In the Pauly case there was a rule which, as pointed out in our opinion, was not for the dispatch of traffic or its safety but was for the very protection of the employee himself—the rule being that before alighting he should look and ascertain where he was stepping.

In the instant case there was a rule that track cars should

stay at least 400 feet behind the car of the train they followed. This rule was undoubtedly for the safety of the track car crew and for the safety of the train for in this case traffic or train movement was involved.

In the instant case the track car employees failed to keep a lookout. In that they were negligent. But the railroad was negligent by statute in furnishing a car with a defective triple valve. By reason of this negligence of the railroad, the train became an obstacle in the course of the track car— a delict of commission as the lack of an obstacle to save Pauly from the effect of his negligence was a delict of omission. The negligence of Lucus and his fellow employee in failing to keep a proper lookout, concurred with the negligence of the railroad, thus causing the accident, just as Pauly's negligence in stepping down without looking, *together with* the negligent omission of the railroad in failing to place an obstacle to interrupt his fall at approximately the track level, caused his (Pauly's) injury. If it were not for the action of the Supreme Court in reversing *Pauly* v. *McCarthy* I would entertain less doubt as to the correctness of the majority opinion in this case.

If the omission of the railroad in the Pauly case reasonably to apprehend the lapse of an employee and to construct a surface which would save him from the injuries consequent to the lapse or to install lights designated to prevent such lapse, coupled with Pauly's negligence, caused the injury in that case, then it is arguable that, by the same token, or a fortiori in this case, the negligence of the railroad in furnishing a car with a defective brake valve coupled with the negligence of Lucus in not keeping a lookout ahead, concurred in causing the injury and made both negligence the combined legal cause of the injury. And if this is so, since contributory negligence is no defense, the question of the plaintiff's damages in this case is a question for the jury.

In this case, is not the omission of the railroad to furnish a good air brake thus causing an obstacle to wit, a freight train, to be suddenly interposed in the course of the track car on which Lucus was riding, coupled with the negligence

of Lucas in not looking ahead, just as much the legal cause of the impact which caused his death as was the omission of the railroad in the Pauly case to place lights and a platform on the bridge the legal cause of Pauly's fall to the creek bottom and hence the legal cause of the injuries due to such impact? Is there any real difference for the reason that in one case the impact was because an obstacle was negligently interposed, which, coupled with the negligence of Lucus, caused the injuries, whilst in the other case an obstacle was negligently not interposed which coupled with Pauly's negligent failure to look caused Pauly to suffer a violent impact caused his injuries?

Of course, the Coray and the Pauly cases are not similar, much less identical, in their facts. The above paralleling process applies only to underlying reasoning.

As stated in the prevailing opinion, there is no dispute that the Safety Appliance Act was violated by the defendant, and the only questions are whether or not the furnishing of the train with a defective triple valve was the proximate cause of decedent's death, and whether the track crew were within the class which the act was designed to protect. I agree with the majority opinion that the "cause" must be the legal cause, and not a mere philosophical cause, or sine qua non cause. But in order for an act or event to be the legal cause it need not necessarily be the sole cause. It is sufficient if it is a substantial causative factor, and not too remote. The fact that other acts or events concurred in producing the injury, does not make the negligent act any the less the legal cause, unless the other acts or events were independent and superseding, so as to break the original chain of causation and set forth a new one.

I cannot agree that the stopping of the train by reason of the defective triple valve was but the creation of a condition upon which the negligence of plaintiff's intestate operated. If the engineer had deliberately, in a spirit of horseplay, "big-holed" the airbrakes, and Lucus had collided with the train which was thus suddenly halted, I think there would be no doubt that the negligence of the engineer in

suddenly stopping the train without reason, would be the proximate and legal cause of any injury to Lucus. I cannot see that the sudden stopping of the train due to the defective air brake was any the less the cause of the death of Lucus in this case.

Of course, if the train had not come to a stop because of the results of a leaky brake valve but because of an intended release of air due to an emergency then there would have been no negligence on the part of the railroad under the Safety Appliance Act and hence the sole cause of Lucus' injury would have been his failure to look and keep more than 400 feet from the rear of the train. And if the train had come to a stop by reason of a leaky brake valve and later, after it had been stalled for some time, a track car had hit it due to a failure of employees manning the track car to keep watch, I would conclude that the leaky brake valve was too remote a cause and therefore not proximate. But in this case the stopping of the train and the impact of the immediately following track car are bound together in point of time and event as a unit happening.

The prevailing opinion cites the interesting and informative debate between Justices Cardozo and Andrews in the famous case of *Palsgraf* v. *Long Island R. Co.*, 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253. As with many students of law who have studied the opinions of the two very able and learned judges in that case, I have some difficulty in seeing any negligence on the part of the railroad when the guards apparently acted to insure the safety of the passenger. But to have held categorically that there was no negligence, would have deprived the legal profession of two very valuable and learned essays on the law of negligence and causation. Mr. Justice Cardozo, and a majority of the court, held that the conduct of defendant's servants was not negligent *as to plaintiff*. I shall discuss hereafter the question of whether or not the furnishing of a defective brake valve by the defendant in this case was negligent as to Lucus, or in other words, whether Lucus was within the class protected by the beneficient provisions of the Safety Ap-

pliance Act. For present purposes, I do not think the opinion of Mr. Justice Cardozo is of any assistance in this case.

Mr. Justice Andrews, in his dissent, adopted the theory of "negligence in the air." That doctrine is generally without support in the cases from the American jurisdictions, and certainly is not followed by this court. But having determined the question of negligence in favor of the plaintiff, Justice Andrews proceeded to deliver an excellent exposition of the law of legal causation. Although lawyers and courts may differ as to the applicability of the principles there announced to the facts of the Palsgraf case, or to any given set of facts, I think the principles set forth, as abstract propositions, are generally accepted by the courts of this country and are firmly embedded in American jurisprudence.

The general rule is stated thus by Mr. Justice Andrews, 162 N. E. at page 103:

"The damages must be so connected with the negligence that the latter may be said to be the proximate cause of the former.

"These two words have never been given an inclusive definition. What is a cause in a legal sense, still more what is a proximate cause, depend in each case upon many considerations, as does the existence of negligence itself. Any philosophical doctrine of causation does not help us. * * * You may speak of a chain, or, if you please, a net. An anology is of little aid. Each cause brings about future events. Without each the future would not be the same. Each is proximate in the sense it is essential. But that is not what we mean by the word. Nor on the other hand do we mean sole cause. There is no such thing."

And again:

"What we do mean by the word 'proximate' is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics."

And further, 162 N. E. on page 104:

"The proximate cause, involved as it may be with many other causes, must be, at the least, something without which the event would not happen. The court must ask itself whether there was a

natural and continuous sequence between cause and effect. Was the one a substantial factor in producing the other? Was there a direct connection between them, without too many intervening causes? Is the effect of cause on result not too attenuated? Is the cause likely, in the usual judgment of mankind, to produce the result? Or, by the exercise of prudent foresight, could the result be foreseen? Is the result too remote from the cause, and here we consider remoteness in time and space. * * * We draw an uncertain and wavering line, but draw it we must as best we can.

"Once again, it is all a question of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

Respondent has cited, and finds comfort in the cases of *St. Louis & S. F. R. Co.* v. *Conarty*, 238 U. S. 243, 35 S. Ct. 785, 59 L. Ed. 1290, and *Lang* v. *New York Central R. Co.*, 255 U. S. 455, 41 S. Ct. 381, 65 L. Ed. 729. In the Conarty case an employee of defendant railroad standing on the footboard of a switch engine was injured when the engine backed into a car not equipped with an automatic coupler and drawbar as required by the Safety Appliance Act. The engine was not engaged in a coupling operation at the time of the collision. The Supreme Court of the United States, in denying recovery, held that plaintiff was not within the class of persons protected by the act. In the Lang case a railroad employee was fatally injured when a freight car upon which he was riding, and which it was his duty to stop by use of a hand brake, collided with a crippled car not equipped with an automatic coupler and draw bar, and he was caught between the two cars. Had the crippled car been equipped with a coupler and draw bar, there would have been sufficient space between the two cars so that decedent would not have been caught between them. The court held that the absence of the coupler and draw bar was not the proximate cause of the injury.

These two cases were distinguished from *Louisville & N. R. Co.* v. *Layton*, 243 U. S. 617, 37 S. Ct. 456, 61 L. Ed. 931, and *Minneapolis & St. L. R. Co.* v. *Gotschall*, 244 U. S. 66, 37 S. Ct. 598, 61 L. Ed. 995, in *Davis* v. *Wolfe*, 263 U. S.

239, 68 L. Ed. 284, 286, 44 S. Ct. 64, 66, where it was said:

"The rule clearly deducible from these four cases is that, on the one hand, an employee cannot recover under the Safety Appliance Act if the failure to comply with its requirements is not a proximate cause of the accident which results in his injury, but merely creates an incidental condition or situation in which the accident, otherwise caused, results in such injury; and, on the other hand, he can recover if the failure to comply with the requirements of the act is a proximate cause of the accident, resulting in injury to him while in the discharge of his duty, although not engaged in an operation in which the safety appliances are specifically designated to furnish him protection."

I think the sentence

"but merely creates a condition or situation in which the accident, otherwise caused, results in such injury"

is in effect another way of stating the principle announced by Judge Andrews in the Palsgraf case, that the accident and its cause cannot be too remote from each other or one is not proximate to the other. Every negligence causes a condition. But we are left with the difficulty of determining when a result is proximate to a cause.

Applying the rules stated by Mr. Justice Andrews in the Palsgraf case, and having in mind the rulings of the Supreme Court of the United States in *Davis* v. *Wolfe* and the Pauly case, I think the question of whether or not the defective brake valve was the proximate cause of the fatal injuries to Lucus was at least a jury question.

It is suggested in the prevailing opinion, and the basis of the decision in the court below was that Lucus was not within the class of persons protected by that provision of the Safety Appliance Act requiring trains to be equipped with brakes in good operating condition. To this proposition I cannot assent. While it is not necessary in this case to circumscribe the classes of railroad employees who fall

within the protection of that provision of the Safety Appliance Act requiring trains to be equipped with brakes in good operating condition, I think that the protection of the statute extends at least to all employees whose duties require or permit their legitimate presence on the tracks. I think that Lucus was clearly within the class protected.

For the foregoing reasons, I think the decision of the trial court should be reversed.

LATIMER, Justice, not participating.